**LIBERTY SALES ASSOCIATES, INC., Plaintiff,**

**v.**

**DOW CORNING CORPORATION, and Hilti Inc.**

**Civ. A. No. 91–cv–3507.**

United States District Court, D. New Jersey.

March 17, 1993.

Richard S. Hyland, Howard D. Scher, Steven E. Bizar, Montgomery, McCracken, Walker & Rhoads, Cherry Hill, NJ, for plaintiff.

Robert S. Forster, Jr., Sandra L. Knapp, Krusen, Evans & Byrne, Westmont, NJ, for defendant Dow Corning Corp.

Daniel J. Graziano, Jr., Brotman & Graziano, P.C., Trenton, NJ, for defendant Hilti Inc.

## OPINION

IRENAS, District Judge.

Plaintiff, Liberty Sales Associates, Inc. ("Liberty"), has asked the court to reconsider its previous decision dismissing Liberty's claim for wrongful termination under the New Jersey Franchise Practices Act, N.J.S.A. 56:10–1 to 29 (the "Act").[1] For the reasons set forth below, this motion will be denied.

## I. PROCEDURAL HISTORY

This action involves, inter alia, a contract dispute between plaintiff, Liberty, and one of the two defendants, Dow Corning Corporation ("Dow"), over the interpretation of a distributor agreement (the "contract") in which Dow appointed Liberty as a "Master Distributor" of certain "fire stop" products used in construction to retard the spread of fires.

It is undisputed that the contract gave Liberty the exclusive right, in a defined geographic area, to sell fire stop products bearing Dow's identifiable trademark or trade name. The parties hotly contest whether the contract permitted Dow to sell unbranded or private label fire stop products, which are chemically similar or identical to the branded products, to another distributor competing with Liberty in the same territory.

The dispute surfaced when Liberty learned in 1988 that Dow was selling unbranded fire stop products to defendant, Hilti, Inc. ("Hilti"), who was competing for business in Liberty's territory. As a result of this dispute, Dow later refused to renew its contract with Liberty.

Liberty filed this action on August 2, 1991 asserting claims against Dow for breach of contract, breach of implied obligations of good faith and fair dealing, tort, and a claim for wrongful termination under the Act. The original complaint contained five counts against Dow. On May 13, 1992, plaintiff amended the complaint adding counts six and seven to assert claims for fraudulent and negligent misrepresentation respectively.

Shortly thereafter, Dow moved for summary judgment on all counts. On August 7, 1992 this court filed an opinion and order granting defendant's motion in part, and specifically granting defendant's motion to dismiss plaintiff's claim under the Act. That decision was based largely on the absence of

---

1. This claim is set forth in count five of the amended complaint.

evidence that Dow had granted Liberty the license required as a predicate to the Act's applicability. *Liberty Sales Associates Inc. v. Dow Corning Corporation,* Civ. No. 91–3507, at 9 (D.N.J. Aug. 7, 1992).

In dismissing the franchise claim the court relied in part upon *Finlay & Associates, Inc. v. Borg–Warner Corp.,* 146 N.J.Super. 210, 369 A.2d 541 (Law Div.1976) *aff'd* 155 N.J.Super. 331, 382 A.2d 933 (App.Div.1978), and *Instructional Systems, Inc. v. Computer Curriculum Corp.,* 243 N.J.Super. 53, 59–61, 578 A.2d 876 (App.Div.1990), both of which had held that the distributor contracts in question, had not created a license within the meaning of the Act. *Liberty Sales Associates · Inc.,* at 10.

On October 19, 1992, the New Jersey Supreme Court reversed the Appellate Division's decision in *Instructional Systems, Inc.* and found that the Act did apply to the distribution contract in that case. *Instructional Systems, Inc. v. Computer Curriculum Corp.,* 130 N.J. 324, 614 A.2d 124 (1992). In light of this decision the court agreed to reconsider its initial grant of summary judgment on this claim.

## II. FACTUAL BACKGROUND

On June 5, 1986, Liberty Sales and Dow Corning entered into a distributor agreement whereby Liberty became Dow's "sole Master Distributor" of fire stop foam and sealant[2] in Pennsylvania, Delaware, and designated portions of southern New Jersey and western New York.[3] The initial contract term ran from April 1, 1986 until December 31, 1987, although, the termination clause provided that either party could terminate the agreement with or without cause upon 30 days prior written notice. Plaintiff's Exhibit 11, 1986 Master Distributor Agreement, at 5.

Two letter agreements dated December 18, 1987 and December 20, 1988, extended the contract through December 31, 1989. *Id.,* at 5.[4]

This litigation focuses on the interpretation of the contract's "Appointment and Acceptance" clause:

> Dow Corning appoints Distributor as the sole Master Distributor of Distributor Products to the Market in the Territory for the Fire Stop Foam and Sealant Segment of the Dow Corning Elastomers and Engineering Industries Business. Dow Corning agrees that, so long as this Agreement is in force, it will not appoint any other Master Distributor of Distributor Products to service the Market in the Territory.

*Id.,* at 2. Liberty asserts that in its territory it was the exclusive distributor of Dow manufactured fire stop products, whether branded or unbranded. Dow argues with equal fervor that Liberty was a Master Distributor only for goods bearing the Dow name and mark.

On July 1, 1987 Dow entered an agreement whereby Hilti became a distributor of Dow manufactured fire stop products which were chemically similar to the branded products sold by Liberty. This agreement authorized Hilti to sell these products under its own private label. Dow's agreement with Hilti specifically prevented Hilti from representing to customers or to third parties that Dow was the manufacturer of the goods or that Hilti was in any manner affiliated with Dow.

Hilti's sales were not geographically restricted, although there is some indication that Dow did not intend for Hilti to compete directly with Liberty and its other Master Distributors. Nonetheless, Liberty alleges that that is precisely what happened.

---

**2.** The schedule of distributor products for the 1986 Distributor Agreement listed DOW CORNING© Fire Stop Foam—Catalog No. 2001 and DOW CORNING© Fire Stop Sealant—Catalog No. 2000. Plaintiff's Exhibit 11, Distributor Agreement. This agreement was later expanded to include DOW CORNING Fire Stop intumescent Wrap No. 2002.

**3.** Liberty's territory was expanded by letter agreement dated February 13, 1989, adding the District of Columbia, northern Virginia, Mary-

land and all of New Jersey. Defendant's Exhibit 6.

**4.** Prior to entering the exclusive 1986 Master Distributor Agreement, Liberty had been selling Dow Corning fire stop products under non-exclusive, annual distribution agreements since October 17, 1979. Neither the terms of those prior non-exclusive agreements nor the parties' prior course of dealing is directly relevant to the instant motion.

When Delaney, Liberty's principal and president, learned early in 1988 about the Hilti agreement, he complained that Dow's sales to Hilti violated its contract with Liberty. Delaney also conveyed his concerns about direct competition from Hilti in Liberty's exclusive territory.

Although the Dow–Liberty contract term expired on the last day of 1989, the parties continued their commercial relations throughout 1990 without a written agreement. In November of 1990 Dow sent a proposed revised distributor agreement to Liberty which included the express right of Dow to sell, without geographic restriction, the same products to other distributors for resale under their own brand name and trade dress as private label products.[5] Delaney rejected the proposal and offered instead to renew the contract on its original terms, an offer Dow rejected. Early in 1991 Dow ceased supplying Liberty with product, and Liberty filed suit on August 2, 1991.

## III. LEGAL ANALYSIS

Although we previously granted Dow's motion for summary judgment on Liberty's franchise claim, we will consider this motion de novo.[6] The only question before the court is whether Liberty has presented evidence from which a reasonable factfinder could decide that Liberty's and Dow's relationship satisfied the definitional prerequisites of the Act. Therefore Fed.R.Civ.P. 56 provides the relevant standard.

The standard for granting a motion for summary judgment is demanding and stringent. *Wilson v. Sullivan*, 709 F.Supp. 1351 (D.N.J.1989). Under Rule 56(c), "summary judgment is proper 'if the pleadings, deposi-

tions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The Court has stated that "a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (citation omitted) (internal quotations omitted).

Because plaintiff's sole argument is that its franchise claim should be reinstated in light of the New Jersey Supreme Court's decision in *Instructional Systems, Inc. v. Computer Curriculum Corp.*, 130 N.J. 324, 614 A.2d 124 (1992), a close comparison of that court's analysis to the undisputed facts of this case is required.

*Instructional Systems* considered whether the contractual relationship between a manufacturer of a computerized educational-learning system ("CCC") and its exclusive regional distributor ("ISI") created a franchise within the meaning of the Act. Although the case started in the federal court as a diversity action, after cross-motions for summary judgment, the trial judge remitted questions concerning the "license," "place of business" and "community of interest" requirements and the extraterritorial application of the Act to the Chancery Division of the New Jersey Superior Court.[7]

Both parties agreed to submit the case to the Chancery Division on the District Court

---

**5.** The relevant portion of paragraph 18 of the proposed revised agreement stated, "The parties acknowledge and agree that DOW CORNING has previously established direct commercial relationships with companies that resell its fire stop products under their own brand name and product dress. DOW CORNING intends to continue to supply products to such customers for resale under the customer's private label brand names. The supply of such products to repackagers and private label customers shall not be considered as a breach of this agreement." Defendant's Exhibit 4, Revised Distributor Agreement, at 5.

**6.** Even if we were to consider this motion as one for reconsideration under Local Federal Practice Rule 12(I) we would still be required to apply the summary judgment standard because the *Instructional Systems* decision is clearly a "controlling decision" within the meaning of the Rule. Lite, N.J. Federal Practice Rules, 12(I).

**7.** The order of remand to the New Jersey state courts was made pursuant to the abstention doctrine articulated in *Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). Both academicians and courts vigorously debate whether it is appropriate to invoke *Pullman* abstention in a diversity case

record without further discovery. Insofar as relevant to this case, the Chancery judge found that (i) a California choice of law provision in the agreement would not bar applicability of the Act; (ii) "CCC had granted to ISI a license to use its trade name;" (iii) "there could be 'no other reasonable conclusion' but that CCC and ISI had 'contemplated' that plaintiff would have a 'place of business' in New Jersey as required by the Act for coverage;" and (iv) a "sufficient mutual dependence existed between the parties to form the Act's 'community of interest' requirement." *Id.* at 331–32, 614 A.2d at 127–28.[8]

The Appellate Division reversed, but the lower court judgment was reinstated by the New Jersey Supreme Court which found that the commercial relationship embodied in the 1984 Reseller Agreement between ISI and CCC could support a finding that the "place of business," "license" and "community of interest" requirements of the Act were satisfied. *Id.* at 348–66, 614 A.2d at 137–46.

■ Although the contract between Dow and Liberty has a provision stating that Michigan law shall govern, it is clear from *Instructional Systems* that a franchisor cannot deny its New Jersey franchisee the protection of the Act merely by stating that its home state's law will govern the contract. *Instructional Systems* at 342–45, 614 A.2d at 133–35. Therefore, this court must determine if the pleadings and affidavits create a genuine issue as to material facts which would support a finding that plaintiff has satisfied all of the Act's requirements—a place of business, license and community of interest. Plaintiff's failure with respect to any one of these issues will defeat the claim.

A. *Did the 1986 Master Distributor Agreement contemplate that Liberty would maintain a "place of business" in New Jersey?*

■ The statute provides that, "This Act applies only to a franchise (1) the perfor-

mance of which contemplates or requires the franchisee to establish or maintain a place of business within the State of New Jersey." N.J.S.A. 56:10–4. The Act defines "place of business" as a "fixed geographical location at which the franchisee displays for sale and sells the franchisor's goods or offers for sale and sells the franchisor's services. Place of business shall not mean an office, a warehouse, a place of storage, a residence or vehicle." N.J.S.A. 56:10–3(f).

The Supreme Court stated that the latter portion of this definition is "the more significant aspect of the 'place of business' requirement because it ensures that only those businesses that operate as genuine franchises will obtain the protection of the Act." *Instructional Systems* at 349, 614 A.2d at 137.

In *Instructional Systems* the Court noted that, although the parties' agreement did not require ISI to maintain a place of business in New Jersey, ISI had done so since 1977. *Id.* at 348, 614 A.2d at 137. Liberty has maintained a business location in New Jersey at all times since its inception in 1976. Delaney Affidavit, at 7. Clearly Liberty had a business location in New Jersey when Dow and Liberty signed their first agreement in 1979 and when they entered their first master distributor agreement in 1986. There is certainly a factual basis at this stage of the litigation to permit the inference that Dow contemplated that Liberty would always maintain a business location in New Jersey. The only inquiry on this issue is whether Liberty's business location is a "place of business" as defined by the Act.

ISI's only business location was a 6,000 square foot facility on the sixth floor of a commercial office building in Hackensack. *Id.,* at 350, 614 A.2d at 137. ISI specifically constructed its Hackensack facility so that CCC's products could be demonstrated and

---

solely because there are undecided issues of state law, even in areas of particular state concern. *See* Chemerinsky, FEDERAL JURISDICTION, § 12.2.2 (Little, Brown and Company 1989); Sloviter, *A Federal Judge Views Diversity Jurisdiction Through the Lens of Federalism,* 78 Va. L.Rev. 1671, 1676–1684 (1992).

8. The Chancery Division also made rulings concerning whether the Act might have extraterritorial application, an issue which we do not reach in this opinion.

instruction could be given to customers. ISI purchased and installed "CCC Microhost computer hardware," and had given hundreds of product demonstrations to education professionals from all over the country. *Id.*

By contrast, Liberty's "place of business" was Delaney's house and garage in which Liberty "typically stored $25,000 to $30,000 of Dow Corning's stock." Delaney Affidavit, at 7. Customers would come to the garage to pick up material which they had ordered. There appears to have been some customer training in product use in Delaney's home, but it is indisputable from the record that most training was conducted at customers' job-sites.

Ignoring for the moment that Liberty's place of business was its president's house, Liberty's office/warehouse is clearly not the type of business facility contemplated in the definition. Most of Liberty's operations were Delaney's sales efforts, sometimes by phone from his home and sometimes in the field, to encourage contractors, engineers and architects to specify fire stop products which matched the qualities of the Dow products he sold. After orders were taken and filled, "[c]ustomers stopped at Liberty's New Jersey office on a weekly basis to pick up *their shipments* of Dow Corning's fire stop products." Delaney Affidavit, at 8 (emphasis added). Delaney's home was used primarily as an office for telephone sales calls, paper work and an occasional meeting or demonstration, and as a short-term warehouse.

■ *Instructional Systems* teaches that the place of business requirement "means there must be a sales location in New Jersey. Mere distribution through an office or warehouse would not qualify." *Instructional Systems* at 349, 614 A.2d at 137 (quoting *Greco Steam Cleaning, Inc. v. Associated Dry Goods Corp.*, 257 N.J.Super 594, 598, 608 A.2d 1010 (Law Div.1992)). Simply making telephone sales calls from an office will not convert that office into a sales location within the meaning of the Act.

Even granting plaintiff the benefit of every favorable inference, the court cannot avoid the conclusion that Liberty's business location was essentially just an office and storage area for customers' orders. Of the five cate-

gories specifically *excluded* from the statutory definition, Liberty's facility clearly falls within four of them. It was an "office," a "warehouse" (Delaney's garage), a "place of storage," and a "residence."

■ Our conclusion that Liberty's office/warehouse is not a "place of business" under the Act should not suggest that any partial use of a business facility for storage or office work automatically excludes the facility from falling within the statutory definition. However, the Act's definition contemplates a location where selling is a major activity—a particular kind of selling involving the interplay of goods on display, the physical presence of the customer and the selling efforts of the vendor. It does not contemplate a personal residence in which goods are primarily present in the garage for storage, and in which sales efforts are basically limited to telephoning potential buyers.

Because a place of business in New Jersey is an independent requirement, Liberty's failure to meet this requirement prevents plaintiff from pursuing a claim under the Act.

*B. Did Dow grant a "license" to Liberty as a result of the 1986 Master Distributor Agreement?*

■ For the Act to apply, a franchisor must have granted a "license to use a trade name, trade mark, service mark, or related characteristics." N.J.S.A. 56:10–3(a). The *Instructional Systems* court observed that obviously "not every grant of permission to use a trademark in the sale of goods or services is a "license" within the meaning of the Franchise Act." *Instructional Systems*, 130 N.J. at 352, 614 A.2d at 138.

The court explained that even if a vendor received a majority of its revenues from the sale of one brand of product, which it marketed using the manufacturer's name, this use would not be sufficient to deem the arrangement a license. *Id.* Quoting the Third Circuit, the court noted that, " 'if this limited agreement constitutes a license to use a trademark, then any business selling a name brand product would, under New Jersey law, necessarily be considered as holding a license.' " *Id.* (quoting *Colt Industries Inc. v.*

*Fidelco Pump and Compressor Corp.*, 844 F.2d 117, 120 (3d Cir.1988)).

The license contemplated by the Act is one in which the franchisee wraps himself with the trade name of the franchisor and relies on the franchisor's goodwill to induce the public to buy. This concept was articulated in *Neptune T.V. & Appliance Serv., Inc. v. Litton Sys., Inc.*, 190 N.J.Super 153, 462 A.2d 595 (App.Div.1983), a case cited and quoted with approval in *Instructional Systems*, 130 N.J. at 352–54, 614 A.2d at 138–40.

In *Neptune T.V.* the court observed that the hallmark of a franchise license is that the franchisor gives its imprimatur to the franchisee's business enterprise and its mark induces the "consuming public to expect from [the franchisee] a uniformly acceptable and quality controlled service endorsed by [the franchisor] itself." 190 N.J.Super at 160–161, 462 A.2d at 599. What distinguishes a franchise from an ordinary distributorship is that the goodwill inherent in the name and mark attaches to the entire business of the seller, not just to the goods themselves.

*Instructional Systems* rejected the notion that the franchisee must be the total alter ego of the franchisor, 130 N.J. at 354–355, 614 A.2d at 140, but noted:

> Even were we to seek an *alter-ego* standard for the franchise-license requirement, the record is replete with evidence that such a merger of identity actually existed. ISI's reputation throughout the Northeast has always been exclusively as a CCC distributor."

*Id.* at 355, 614 A.2d at 140.

In concluding that CCC had granted ISI a license, the Court highlighted the contractual provision which required ISI " 'use its best efforts to maintain and promote CCC's name, trademark and logo on the Products' " and which prohibited ISI from selling, developing or designing any products competitive with CCC's products. *Id.* at 353–354, 614 A.2d at 139 (emphasis deleted).

In the instant suit the normal franchisor-franchisee relationship is turned on its head. Unlike the classic franchise relationship where the dominant theme is the franchisee's exploitation of the franchisor's reputation

and goodwill, the record in this case makes clear that Dow's effort to capitalize on Delaney's reputation as the "foam man" was an important factor behind the relationship. Delaney Deposition, at 37–38.

Unlike the "unique combination of hardware and software" marketed by ISI, Dow's fire stop products were sold in a competitive marketplace where the perceived "quality" of the product was only one of many factors that promoted sales. Apart from cost considerations, a would-be buyer relied not only on the goodwill embodied in Dow's trade name or mark but also to a considerable extent on Delaney's expert advice on whether the product was suitable for its intended use and, if so, how it might be used.

Delaney's reputation as the "foam man" came not only from selling Dow products, but also from selling competing products, and unlike the ISI–CCC agreement, nothing in the contract prevented Liberty from continuing this practice. Defendant's Brief, at 12. Dow's attempt to market unbranded fire stop products, which led to the confrontation before the court in this case, is a telling reminder that the goodwill inherent in the Dow mark was not necessarily essential to the selling effort.

The 1986 Master Distributor Agreement provided that "Distributor agrees that it will not use any Dow Corning trademarks in connection with the resale of Distributor Products except in a manner and to the extent that Dow Corning may give its prior written approval." Defendant's Exhibit 2, at 4. Plaintiff argues that despite the provision's phrasing in the negative, Dow not only freely allowed but actually encouraged Liberty to use Dow's name to promote the fire stop products.

Dow authorized Liberty to provide nylon jackets, chrome-plated tape measures, and deluxe Parker pens with both Dow's and Liberty's names printed on them as promotional gifts. In addition to allowing Liberty to use Dow's name in advertising and promotional activities, Dow actually contributed 50 percent of the cost for certain pre-approved advertisements in trade publications. Delaney Affidavit, at 9.

 A manufacturer of branded goods will certainly not object, and may encourage, a distributor to use its name or mark to encourage sales. This kind of use does not turn a distributor or seller of goods into a licensee for purposes the Act. *Instructional Systems* at 352, 614 A.2d at 138. Rather, it is the obligation of the franchisee to promote the mark itself, as distinct from merely using it to make sales, which distinguishes a license meeting the Act's requirements from the right to use a mark that any reseller of goods gets when purchasing those goods from the owner of the mark.[9] *Id.*

The importance of this distinction becomes apparent when the ISI–CCC agreement is compared to that between Dow and Liberty. The ISI–CCC agreement required ISI "to *'use its best efforts* to maintain and *promote* CCC's name, trademark and logo on the Products'" (emphasis added). By contrast, the corresponding clause in the Dow–Liberty contract referred only to the promotion of distributor's products, as distinct from Dow's name or trademark.

Because the "CCC computerized-educational-learning system is not an 'off-the-shelf' product that can be purchased at the neighborhood appliance store," but a "unique combination of hardware and software whose identity is integrally related with that of ISI," *Id.* at 353–54, 614 A.2d at 139, it is not surprising that ISI's "license" would contemplate the promotion and expansion of CCC's name and mark.

Nothing in this case suggests that Liberty's identity was "integrally related with that of" Dow, and the contrary is strongly suggested. The fire stop products were indeed "off-the-shelf." Dow needed the "foam man" more to sell its products than to promote the goodwill attached to the name itself. Liberty's efforts may have created some goodwill for itself and Dow, as would any vendor who successfully markets a manufacturer's product. But this accretion of goodwill to the mark does not by itself create a license under the Act. *Id.* at 358, 614 A.2d at 141.

9. A distributor who resells branded products without alteration is not an infringer of the manufacturer's mark or brand name and therefore

## IV. CONCLUSION

The "community of interest" requirement as a predicate to the Act's applicability involves a detailed analysis which at some level overlaps the license analysis, but also involves different considerations. *See, e.g., New Jersey American, Inc. v. Allied Corp.,* 875 F.2d 58 (3d Cir.1989); *Neptune T.V. & Appliance Serv., Inc. v. Litton Sys., Inc.,* 190 N.J.Super 153, 462 A.2d 595 (App.Div.1983). Because plaintiff failed to demonstrate a factual basis for its claim that Liberty had a license or place of business within the meaning of the Act, we need not consider whether the party's relationship created a community of interest.

For the reasons set forth above, the court's prior decision to grant summary judgment for defendant on count five is not inconsistent with the New Jersey Supreme Court's decision in *Instructional Systems,* and plaintiff's motion to reconsider the dismissal of Count five is denied.

The court will enter an appropriate order.

does not need a license. 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 25.11.