

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-22-1995

# Cooper v Amana

Precedential or Non-Precedential:

Docket 94-5569

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Cooper v Amana" (1995). *1995 Decisions.* Paper 231.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/231

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
—————————

No. 94-5569 and 94-5570
—————————

COOPER DISTRIBUTING CO., INC.,
a New Jersey Corporation,
Appellant in 94-5570

v.

AMANA REFRIGERATION, INC.,
a Delaware Corporation,
Appellant in No. 94-5569
—————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(D.C. Civ. No. 91-05237)
—————————————

Argued:  May 5, 1995
Before:  SLOVITER, <u>Chief Judge</u>, ALITO, <u>Circuit Judge</u>
and SCHWARZER, <u>Senior District Judge</u>*

(Opinion Filed:  August 22, 1995)

—————————————

STEPHEN J. HOLTMAN, ESQ. (Argued)
DAVID A. HACKER, ESQ.
LEONARD T. STRAND
SIMMONS, PERRINE, ALBRIGHT & ELLWOOD
1200 Firstar Bank Building
Cedar Rapids, IA  52401-1266

<u>Attorneys for Appellant and Cross-Appellee,
Amana Refrigeration, Inc.</u>

FRANZBLAU DRATCH
A Professional Corporation
3 ADP Boulevard
Roseland, New Jersey 07068

*Hon. William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation.

On the Brief:
KENNETH K. LEHN, ESQ. (Argued)

Of Counsel:
S. M. CHRIS FRANZBLAU, ESQ.

<u>Attorneys for Appellee and Cross-Appellant,</u>
<u>Cooper Distributing Co., Inc.</u>

BERTRAM P. GOLTZ, JR., ESQ.
Office of Attorney General of
    New Jersey
124 Halsey Street
P. O. Box 45029
Newark, New Jersey  07101

<u>For the Attorney General of the State of</u>
<u>New Jersey</u>

OPINION OF THE COURT

ALITO, <u>Circuit Judge</u>:

Defendant Amana Refrigeration, Inc. ("Amana"), a manufacturer of home appliances, appeals a judgment for $9,375,000 in favor of plaintiff Cooper Distributing Co., Inc. ("Cooper"), a distributor of Amana home appliances. After supplying Cooper with its products for approximately 30 years, Amana attempted to terminate its relationship with Cooper. Cooper sued, claiming that the termination and the circumstances surrounding it gave rise to a variety of state law claims. At trial, Cooper asserted four claims against Amana: (1) illegal termination of a franchise, in violation of the New Jersey Franchise Practices Act ("NJFPA" or "the Act"), N.J.S.A. § 56:10-1 <u>et seq</u>.; (2) breach of contract; (3) breach of the implied

3

obligation of good faith and fair dealing; and (4) tortious interference with prospective business advantage. At the conclusion of a five-week trial, the jury returned a verdict of liability on all four counts and awarded damages as follows: (1) $4.375 million on Cooper's NJFPA claim, (2) $2 million on Cooper's breach of contract claim, (3) $0 on Cooper's claim for breach of the obligation of good faith and fair dealing, (4) $0 in actual damages on Cooper's tortious interference claim, and (5) $3 million in punitive damages on Cooper's tortious interference claim. The district court upheld the entire $9,375,000 verdict and denied Amana's post-trial motions attacking the liability verdicts on Cooper's NJFPA, the breach of contract, and the tortious interference claims.

Amana appeals from the district court's denial of these motions, and Cooper cross-appeals from the district court's denial of its motion for prejudgment interest on its NJFPA claim. For the reasons discussed below, we (1) affirm the district court's denial of Amana's post-trial motions attacking the NJFPA claim, (2) reverse the district court's denial of Amana's motion for a new trial on NJFPA damages, remanding for a new trial on damages, (3) reverse the district court's denial of Amana's motion for judgment as a matter of law on the breach of contract claim, (4) reverse the award of punitive damages on Cooper's tortious interference claim, and (5) affirm the denial of Cooper's motion for prejudgment interest on its NJFPA claim.

I. FACTS AND PROCEDURAL HISTORY

4

Amana began to manufacture home appliances in the 1940's. App. 3954. Currently, Amana is a "full line" home appliance manufacturer: it offers for sale a full set of home appliances, including refrigerators, cooking and laundry appliances, dishwashers, and air conditioners. App. 680. For many years, Amana employed a two-step process in the distribution of its products. It would sell its products to a network of independent wholesale distributors, who, pursuant to agreements with Amana, would sell to retail dealers located in the wholesale distributors' contractually recognized sales regions. The retail dealers would then sell the products to consumers.

Cooper began operating as an independent wholesale distributor in 1931. App. 3954. In 1961, Cooper started to distribute Amana products. Cooper and Amana signed an agreement permitting Cooper to distribute Amana's products in New Jersey and New York and have periodically signed new agreements over the years. Their most recent Distribution Agreement (the "Agreement"), which was signed in 1990, allowed Cooper to distribute Amana products in New Jersey, New York, Connecticut, and Pennsylvania. App. 3978-3983. The Agreement stated that it was to be construed "in accordance with the laws of the State of Iowa." App. 3982.

Beginning in the late 1970's, the majority of Cooper's business (78% to 100%) was derived from the sale of Amana products. App. 644. Cooper also distributed other major brands of appliances, including Hardwick, In-Sink-Erator, and Dacor,

App. 959, although Amana occasionally subjected Cooper to competitive restraints. App. 961-62.

During its relationship with Amana, Cooper operated a showroom/marketing center, first in Newark and subsequently in Englewood Cliffs, New Jersey. Cooper used this facility for Amana product demonstrations, App. 2005-08, dealer training in Amana products, App. 2006, and dealer open houses. App. 690. Cooper's sales managers studied the Amana product line, App. 2013-2017, and in turn gave Amana product training to retail dealers. App. 690-92. Cooper also placed Amana advertisements in the yellow pages and newspapers, App. 1021-22, advertised as an authorized Amana servicer, App. 4016-17, instructed its servicemen to wear Amana uniforms, App. 1963, distributed promotional items bearing the Amana name, App. 1023, and, pursuant to the Agreement, promised to "use its best efforts to promote sales" of Amana products. App. 3979. Cooper's dealers perceived Amana and Cooper as being one and the same. App. 1748.

In the early 1980's, the marketing of appliances began to change, and by the late 1980's most full-line manufacturers had eliminated the first step in the two-step distribution process. App. 1169, 1679-81. Instead of selling to wholesale distributors, the manufacturers sold directly to retail dealers. Consistent with this trend, Amana started to depart from its previous practice of selling its products to the wholesale distributors. Instead, Amana began to sell directly to certain retail dealers located in the wholesale distributors' sales regions. Amana first sold its appliances directly to "national"

6

retail dealers like Sears. App. 988. The Agreement explicitly permitted Amana to make such sales to national retailers. App. 3981. Then, in the summer of 1991, Amana went further. Relying on a provision of the Agreement that reserved for Amana the "right to make sales directly," App. 3981, Amana began to deal directly for the first time with a non-national retail dealer in Cooper's region, P.C. Richard & Son ("P.C. Richard"). P.C. Richard had a chain of 20 retail stores and represented Cooper's largest account. App. 3955. Amana also sold its products directly to other smaller local retail dealers. Until Amana began selling to the national and local retailers, Cooper had been the exclusive distributor in its region for nearly 30 years. App. 988, 2504-06.

At the same time that the home appliance industry saw the elimination of two-step distribution, Amana's marketing responsibilities changed. Amana's parent company, Raytheon, which also sold other appliance brands such as Speed Queen and Caloric, decided to consolidate the distribution of its brands. App. 2322-23. The result was that several of the distributors that sold one but not all of Raytheon's brands were eliminated. In November 1991, Amana terminated its relationship with Cooper pursuant to a provision of the Agreement that allowed either party to terminate the Agreement on ten days written notice. App. 3981. At the same time, Amana also terminated its relationships with 20 of the other 23 remaining Amana wholesale distributors across the country. App. 2825.

7

In response to its termination, Cooper commenced this action in New Jersey state court alleging, among other things, that Amana had (1) violated section 5 of the NJFPA, N.J.S.A. §56:10-5, by terminating Cooper's franchise without good cause; (2) breached the 1990 Agreement by selling to the local retailers in Cooper's region; (3) breached the Agreement's implied obligation of good faith and fair dealing; and (4) tortiously interfered with Cooper's prospective economic advantage. App. 26-46. In November 1991, the state court issued a temporary restraining order prohibiting termination of or interference with Cooper's Amana distributorship. App. 2157. After the case was removed by Amana to federal court,[0] a preliminary injunction was entered on February 10, 1992, enjoining Amana "from taking any action whatsoever to limit . . . or in any way interfere with Cooper's activities as a distributor of Amana products."[0] App. 100-54, 2157.

During the pendency of the injunction, Amana dropped Cooper from its mailing list, thereby allegedly leaving Cooper -- and Cooper's retail dealers -- unaware of Amana discounts and model changes. App. 1067-73. Additionally, Amana refused to support Cooper in its attempt to sell Amana air conditioners to

---

[0]Cooper was incorporated and had its principal place of business in New Jersey; Amana was a Delaware Corporation with its principal place of business in Amana, Iowa. The district court properly exercised jurisdiction pursuant to 28 U.S.C. § 1441.
[0]The Attorney General of the State of New Jersey intervened because Amana raised a Commerce Clause challenge to the extraterritorial application of the NJFPA. We have since held that the NJFPA does not violate the Commerce Clause. See Instructional Systems, Inc. v. Computer Curriculum Corp. 35 F.3d 813 (3d Cir. 1994), cert. denied, 115 S. Ct. 1176 (1995).

Trader Horn, one of Cooper's larger retail dealers.  App. 1047-61.

Trial commenced in February 1994, and after five weeks the jury returned a verdict for Cooper totalling $9.375 million. The jury first found that Cooper had proved that it possessed a franchise under the NJFPA and that Amana's attempted termination violated the Act.  For this violation, the jury awarded Cooper $4.375 million in compensatory damages, a sum that corresponded to the value of the franchise in November 1991, as estimated by Cooper's expert.  The jury also awarded Cooper $2 million on its breach of contract claim, finding that the Agreement had granted Cooper an exclusive regional distributorship and that Amana had violated the Agreement by selling directly to P.C. Richard and other local retailers.  The jury likewise found for Cooper on its claims for breach of the implied covenant of good faith and fair dealing and for tortious interference with prospective business advantage.  With respect to the tortious interference claim, the jury found that Amana had tortiously interfered with Cooper's business relations both by its direct sales to Cooper's local retail dealers and by other unjustifiable conduct occurring after the entry of the preliminary injunction.  Although the jury awarded no actual damages to Cooper on either the implied covenant or tortious interference claims, it did award $3 million in punitive damages on the tortious interference claim.

After trial, the district court entered judgment for Cooper in the amount of $9,375,000 and dissolved the preliminary injunction.  App. 5000-02.  Amana moved for post-trial judgment

9

as a matter of law pursuant to Fed. R. Civ. P. 50(b) and, alternatively, for a new trial pursuant to Fed. R. Civ. P. 59(a). Amana argued: (1) that it was entitled to a judgment or a new trial as to liability under the NJFPA; (2) that it was entitled to a new trial as to damages on the NJFPA claim; (3) that it was entitled to a judgment or a new trial as to liability for breach of contract; (4) that it was entitled to judgment on the tortious interference claim; and (5) that it was entitled to judgment or a new trial on the issue of punitive damages. App. 4927–77.

Cooper moved for attorneys' fees and costs under the NJFPA and for prejudgment interest on its breach of contract and NJFPA recoveries. The district court rejected all of Amana's post-trial arguments, App. 5702–25, and awarded Cooper attorneys' fees and costs, App. 5726–36, and prejudgment interest on the breach of contract claim. However, the district court denied Cooper's request for prejudgment interest on the NJFPA claim. App. 5737–41. Amana appealed, challenging the denial of its post-trial motions. Cooper cross-appealed, seeking additional prejudgment interest. We turn first to the NJFPA issues.

10

II.  NEW JERSEY FRANCHISE PRACTICES ACT

Prompted in large part by the practices of automobile manufacturers and major oil companies, New Jersey enacted the NJFPA in 1971.  See Instructional Systems, Inc. v. Computer Curriculum Corp., 614 A.2d 124, 132 (N.J. 1992) (hereinafter "ISI").  The Act protects franchisees against indiscriminate termination by providing that "it shall be a violation of this act for a franchisor to terminate, cancel, or fail to renew a franchise without good cause."  N.J.S.A. § 56:10-5.  A franchise exists under the NJFPA if: (1) there is a "community of interest" between the franchisor and the franchisee; (2) the franchisor granted a "license" to the franchisee; and (3) the parties contemplated that the franchisee would maintain a "place of business" in New Jersey.  N.J.S.A. §§ 56:10-3a,-4.  Contending that it was not properly held liable under the NJFPA, Amana argues, first, that as a matter of law Cooper was not a "franchisee" under the Act[0] and second, that the district court gave the jury prejudicially erroneous instructions on the NJFPA claim.  We will discuss each of these arguments in turn.

A.  Franchisee as a matter of law.

---

[0]Amana does not argue that the termination of its business relationship with Cooper was for "good cause," a concept that is "limited to failure by the franchisee to substantially comply with those requirements imposed upon him by the franchise." N.J.S.A. § 56:10-5; see also Westfield Centre Services, Inc. v. Cities Service Oil Co., 432 A.2d 48, 55 (N.J. 1981) (holding that a franchisor who in good faith and for bona fide reasons terminates a franchise for any reason other than substantial nonperformance has violated the Act).

11

In reviewing a district court order denying a post-trial motion for a Rule 50(b) judgment as a matter of law, we "determine whether the evidence and justifiable inferences most favorable to the prevailing party afford any rational basis for the verdict." Intermilo, Inc. v. I.P. Enterprises, Inc., 19 F.3d 890, 892 (3d Cir. 1994) (quoting Bhaya v. Westinghouse Elec. Corp., 832 F.2d 258, 259 (3d Cir. 1987), cert. denied, 488 U.S. 1004 (1989)); see also Cassidy Podell Lynch, Inc. v. SnyderGeneral Corp., 944 F.2d 1131, 1137 (3d Cir. 1991). We will apply this standard to each of the three franchise requirements.

    1.  Community of interest.

The NJFPA requires a franchisee to show that it has a "community of interest" with a franchisor. N.J.S.A. § 56:10-3a. The New Jersey Supreme Court has explained:

> Community of interest exists when the terms of the agreement between the parties or the nature of the franchise business requires the licensee, in the interest of the licensed business's success, to make a substantial investment in goods or skills that will be of minimal utility outside the franchise.

ISI, 614 A.2d at 1 (quoting Cassidy, 944 F.2d at 1143). The court continued:

> The Act's concern is that once a business has made substantial franchise-specific investments [which are of minimal utility outside the franchise,] it loses virtually all of its bargaining power. . . . Specifically, the franchisee cannot do anything that would risk termination, because that would result in a loss of much or all of the value of its franchise-specific investments. Thus, the franchisee has no choice but to accede to the demands of the

12

> franchisor, no matter how unreasonable these
> demands may be.

ISI, 614 A.2d at 141; see also Neptune T.V. & Appliance Service, Inc. v. Litton Microwave Cooking Products Div., 462 A.2d 595, 601 (N.J. Super. Ct. App. Div. 1983) (looking to the "vulnerability of the alleged franchisee").

Thus, in order to find a "community of interest," two requirements must be met: (1) the distributor's investments must have been "substantially franchise-specific", ISI, 614 A.2d at 141, and (2) the distributor must have been required to make these investments by the parties' agreement or the nature of the business. N.J.S.A. § 56:10-3a. New Jersey American, Inc. v. The Allied Corporation, 875 F.2d 58, 64 (3d Cir. 1989); see also Colt Industries, Inc. v. Fidelco Pump & Compressor Corp., 844 F.2d 117, 120-121 (3d Cir. 1988) (affirming district court's finding of a lack of community of interest because the franchise-specific investments were "suggested, not required"). In this appeal, Amana has not addressed the second of these requirements,[0] but

---

[0]Because Amana's briefs do not raise or address the question whether Cooper was required to make any franchise-specific investments that were made, we do not believe that that question is properly before us. In any event, however, we believe that there was sufficient evidence to satisfy this requirement. The nature of the business required Cooper to acquire Amana-specific knowledge since, without such knowledge, it would have been unable to educate the retail dealers about Amana's unique products. Amana conceded that such dealer training was "vital" to the successful marketing of Amana products. App. 834, 2012. In addition, the nature of the home appliance industry mandated that Cooper make certain goodwill investments, like purchasing advertising, that benefitted Amana. App. 1566. Also, Cooper was required to implement marketing strategies that were dictated by Amana and were designed to create goodwill. App. 834-35. Finally, although Cooper was not required to limit its

Amana has strenuously argued that Cooper failed to meet the first of these requirements, i.e., that it failed to show that its investments were substantially franchise-specific.

The question of substantial franchise-specificity depends on whether Cooper's investments were "useful beyond the relation the contract in question create[d]." Cassidy, 944 F.2d at 1144. Amana argues that Cooper's investments -- specifically (1) Cooper's knowledge of home appliances, (2) its goodwill, and (3) its tangible assets -- were "tremendously useful" outside the context of its relationship with Amana, New Jersey American, 875 F.2d at 64, and therefore were not substantially franchise-specific.[0] Although we do not find Cooper's evidence on this point to be overwhelming, we conclude that a reasonable jury could have found that Cooper's assets were substantially franchise-specific.

First, we note that Cooper made a significant investment in the acquisition of knowledge about Amana products. In Cassidy, we held that a franchise-specific investment could take the form of the "years of effort required to gain specialized skills or knowledge valuable to market the licensed product efficiently, but of little use beyond that." Cassidy,

---

distributing solely to Amana products, App. 959, Amana imposed various competitive restraints. App. 961-62, 171-172. Thus, a reasonable jury could have concluded that Cooper was required to make its franchise-specific investments.
[0]As an example of a franchise-specific investment, the New Jersey Supreme Court noted that "McDonald's franchisees were required for many years to purchase and install `Golden Arches,' which [would be] of little value if the franchise were lost." ISI, 614 A.2d at 141.

14

944 F.2d at 1144.  Here, Cooper introduced evidence that its employees invested much time over the years in acquiring knowledge about Amana products and that this knowledge was not transferable outside the Amana-franchise context.  Robert Nathan, a Cooper sales manager, testified that he spent 200 hours a year (10% of his time) learning about Amana products, App. 2013, and that much of what he and his sales force learned during this time related to Amana products that contained "exclusive or unique features not generally found in comparable products performing the same purpose in the marketplace."  App. 2014; see also App. 2015-17; 1964-70 (identifying unique Amana features).  He added that this knowledge would be "of no value," App. 2027, and "useless," App. 1968-69, outside the realm of Amana sales.[0]

Second, and perhaps most important, a reasonable jury could find that one of Cooper's most important assets was franchise-specific goodwill.  It is clear that goodwill can constitute a franchise-specific asset.  See New Jersey American, 875 F.2d at 62; ISI, 614 A.2d at 144; Neptune, 462 A.2d at 599.  To qualify, however, the goodwill in question must be useful for

---

[0] Amana contends that since its products change yearly, Cooper's knowledge of Amana's products would become obsolete in time.  Therefore, Amana maintains, the termination did not cause Cooper to lose the value of its franchise-specific knowledge. This argument, however, merely shows that Cooper's Amana-specific knowledge, like virtually any other asset, was subject to depreciation.  Thus, this argument does not show that Cooper's Amana-specific knowledge was valueless.  On the contrary, we believe that a reasonable jury could conclude that, as of the date of termination, Cooper's Amana-specific knowledge still retained substantial value.  See, e.g., App. 2012-19 (sales manager Nathan discussing how his vast product knowledge would be rendered useless by termination).

15

the alleged franchisee only in the context of its relationship with the alleged franchisor.  Moreover, if a distributor sells the products of many manufacturers and creates some goodwill for all or many of these manufacturers, that kind of goodwill "cannot be enough to create a `community of interest.'"  ISI, 614 A.2d at 141.[0]

In this case, it is undisputed that Cooper's investments created goodwill.  See App. 1023 (promotional items bearing the Amana name); App. 1021-22 (yellow page and newspaper advertising of Amana products); App. 1025 (in-store demonstrations of Amana products).  Further, there is evidence in the record that goodwill accounted for nearly half the value of the Cooper franchise.  App. 1813-16, 4605 (Cooper valuation expert, Melvin Konner, determining the value of the franchise and the portion of the value attributable to goodwill).

In addition, Cooper provided substantial evidence that much of this goodwill was not transferable.  For example, sales

_____

[0]As the ISI court elaborated:

> To develop goodwill generally for a product cannot be enough to create a community of interest.  Otherwise, any licensee distributing a brand-name product could claim it has a community of interest with its supplier.  For example, a department store selling Sony name products could claim a community of interest with the manufacturer despite the fact that the department store's goodwill investments are not intimately tied to the manufacturer and therefore lack the economic character of genuine franchise investments.

614 A.2d at 141.

manager Nathan explained that it was not possible for Cooper's salespeople, after representing for many years that Amana's products were superior, to claim, after the termination, that another product was even better. App. 3238 ("I've been telling everybody Amana's the greatest thing since love the last 12 years, and now I got to go out and say wait a second, we have this other line called Friederich, it's the greatest thing since love. Who's going to believe that."). Even Michael Napoletano, a retail dealer who testified for Amana, admitted that Cooper would have a credibility problem if it took such an approach. App. 2806-07.

This point is supported by the New Jersey Supreme Court's decision in ISI. There, the court held that Computer Curriculum Corp. ("CCC"), a producer of computer learning systems, had a community of interest with Instructional Systems, Inc. ("ISI"), a regional distributor of CCC's products. Part of the reason that the court found the existence of a community of interest was that ISI's previous efforts at creating goodwill for CCC's products gave rise to a credibility problem for ISI outside the CCC context. The court explained:

> For close to twenty years, ISI has persuaded
> its customers to choose the CCC's system. The
> goodwill . . . would vanish in the event of a
> termination.

ISI, 614 A.2d at 144; see also id. ("ISI's competitors, including CCC, would denigrate ISI with references to its prior endorsement of the CCC product line.").

17

It is also noteworthy that Cooper's customers, the retail dealers, viewed Cooper and Amana as "one and the same." App. 2796-97; see also id. at 1748 ("Amana was Cooper, Cooper was Amana"). This fact lends support to the conclusion that Cooper's investments in goodwill were not transferable. See ISI, 614 A.2d at 145 (relying on the fact that "the evidence revealed that ISI's customers considered ISI and CCC as synonymous").

Finally, we consider Cooper's investments in tangible assets. The NJFPA protects franchise-specific "tangible capital investments, such as `a building designed to meet the style of the franchise, special equipment useful only to produce the franchise product, and franchise signs.'" ISI, 614 A.2d at 141 (quoting New Jersey American, 875 F.2d at 62). In this case, Cooper introduced evidence showing that it had invested in some tangible items that were of no value outside the Amana-franchise context -- for example, the display housing for Cooper's showroom bearing the Amana logo, App. 1034, Amana product literature, App. 1032, and Amana demonstration models.

We do not mean to imply that all of Cooper's investments were Amana-specific. On the contrary, the record shows that Cooper possessed assets that would clearly be useful outside the Amana context. See, e.g., App. 1041 (electronic mail system), App. 1032-22 (computer system), App. 1036-37 (repair tools).[0] However, the jury was not required to find that

---

[0]The parties dispute whether Cooper's investment in Amana inventory, App. 3343-45, and whether its investment in the showroom, the parts display area, and the service office, App. 1034-38, were franchise-specific. Because we believe that

Cooper's investments were <u>entirely</u> franchise-specific but merely that they were "<u>substantial[ly]</u> franchise-specific." <u>ISI</u>, 614 A.2d at 141 (emphasis added). Looking at all of the evidence of Cooper's investments in the light most favorable to Cooper, we hold that a jury reasonably could conclude that Cooper's assets were substantially franchise-specific.

This holding is supported further by the fact that, as of the termination, 85% of Cooper's revenues were derived from Amana products. App. 664, 679-80, 987-88.[0] While we have held that dependence on a single supplier cannot automatically qualify a distributor for protection under the Act (or else "all exclusive distributors could unilaterally decide to convert their distributorships into franchises," <u>Cassidy</u>, 944 F.2d at 1141), the New Jersey Supreme Court has characterized economic dependence as perhaps the "most important" factor in determining whether a community of interest exists. <u>ISI</u>, 614 A.2d at 145.

2. License.

Before a party may be deemed a "franchisee" subject to the Act's protections, it must show that it has been granted "a license to use a trade name, trade mark, service mark, or related

---

Cooper's investments were substantially franchise-specific even if these particular investments were not, we need not decide these disputes.

[0]The Act states that a distributor cannot be a franchisee if it derives 20% or less of its gross sales from its franchisor, <u>see</u> N.J.S.A. § 56:10-4, implying "that a firm may be a franchise even if only 21% of its gross sales are derived from the franchisor." <u>New Jersey American</u>, 875 F.2d at 63.

characteristic[]." N.J.S.A. § 56:10-3a.  The New Jersey Supreme

Court has explained that "the Act's `license to use' requirement

does not encompass a definition of license in the word's broadest

sense, that is:  permission to do something [that] without the

license would not be allowable."  ISI, 614 A.2d at 138.

Accordingly, the mere fact that Cooper was permitted to use the

Amana insignia, an act that would normally "not be allowable" due

to trademark laws, did not in itself create a license. Otherwise,

"any business selling a name brand product would, under New

Jersey law, necessarily be considered as holding a license."

ISI, 614 A.2d at 138 (quoting Colt Industries, Inc. v. Fidelco

Pump & Compressor Corp., 844 F.2d 117, 120 (1988)). Instead, the

term "license" is more narrowly defined.  It means "to use as if

it is one's own.  It implies a proprietary interest . . . ."

Finlay & Assoc., Inc. v. Borg-Warner Corp., 369 A.2d 541, 546

(N.J. Super. Ct. Law Div. 1976), aff'd on other grounds, 382 A.2d

933 (N.J. Super. Ct. App. Div.), certif. denied, 391 A.2d 483

(N.J. 1978).  The New Jersey Supreme Court has further explained:

> At a minimum, the term "license" means that
> the alleged franchisee must use the name of
> the franchisor "in such a manner as to create
> a reasonable belief on the part of the
> consuming public that there is a connection
> between the . . . licensor and the licensee
> by which the licensor vouches, as it were,
> for the activity of license." Neptune, 402
> A.2d at 599.

ISI, 614 A.2d at 138; see also Neptune, 462 A.2d at 599 (noting

that the hallmark of a license is that the franchisor gives its

20

approval to the franchisee's business enterprise with regard to the franchisor's product such that the public is induced "to expect from [the franchisee] a uniformly acceptable and quality controlled service endorsed by [the franchisor] itself").

Amana maintains that it did not vouch for Cooper's activities in relation to the Amana name. We hold, however, that a reasonable jury could have inferred the existence of a "license" based on various aspects of the lengthy Amana-Cooper relationship. We note that Cooper's showroom displayed the Amana sign, App. 723-24, and Cooper's servicemen wore Amana uniforms. App. 1963, 4077. In these respects, this case resembles Cassidy, where the distributor "maintained signs bearing [the manufacturer's] name" at its facility and employed "servicemen [who] wore uniforms bearing the [manufacturer's] tradename." Cassidy, 944 F.2d at 135.

There was also evidence that Cooper's employees, like those of the plaintiff in ISI, were "integrally related" to the proper functioning of Amana products, ISI, 614 A.2d at 139, and this relationship could reasonably be viewed as likely to strengthen the public perception that Amana vouched for Cooper's use of its name. The Agreement required Cooper to give "warranty" service on the Amana product line. App. 3801, 794. Cooper advertised as a "servicer" of Amana products, App. 4016-17, and on occasion made in-home visits to consumers with product problems. App. 1743-44. Cooper was responsible for fixing certain defective Amana products, App. 809-810, was an "authorized [Amana] parts distributor," App. 4011-4014, and could

21

give "factory authorized service." App. 4016-17. Amana itself also emphasized that Cooper's customer service was important so that customers would distinguish Amana from other manufacturers, App. 808, and Amana stressed that it was "vital" for Cooper to train its dealers in the "unique" features of Amana products. App. 834. See also App. 17, 2012.[0]

It is likewise noteworthy that Cooper was the exclusive Amana distributor to local dealers in Cooper's four-state territory for 30 years, App. 988, 2504-06, and that Amana allowed Cooper to maintain advertisements in the yellow pages and newspapers stating that it was an authorized distributor and servicer of Amana products. App. 4011-21. In ISI, the New Jersey Supreme Court found these factors to be highly important. See ISI, 614 A.2d at 139-140.[0]

---

[0] Amana argues that ISI is distinguishable since the court there noted that the franchisee "educate[d] and train[ed] users" of the franchisor's product, ISI, 614 A.2d at 139 (emphasis added), while Cooper only trained dealers. We can see no significance in this distinction for present purposes. Under the Agreement, Cooper sold to dealers, not consumers. App. 3979. It therefore follows that the public, for the purposes of determining whether a perception existed that Amana vouched for Cooper, must be the dealers, not the consumers. This is buttressed by the fact that the Act expressly applies to wholesalers, who do not typically sell to consumers. See N.J.S.A. § 56:10-3(a) (noting that Act applies to "the marketing of goods or services at wholesale, retail, . . . or otherwise") (emphasis added).

[0] Amana claims that ISI is distinguishable in this regard because ISI was required to hold itself out as a CCC distributor, see ISI 614 A.2d at 139, whereas Cooper was merely allowed to hold itself out as an Amana distributor. We find this distinction to be without merit because in Neptune, a case upon which the ISI court relied heavily, the court found a license despite the fact that the plaintiff was merely allowed to hold itself out as an authorized service center for the defendant. See Neptune, 462 A.2d at 599.

It is also significant that Cooper was required under the Agreement to use its best efforts to promote Amana sales. App. 3979. In ISI, the New Jersey Supreme Court found it significant that the franchisee was required to use its best efforts to promote the franchisor's name. 614 A.2d at 139.[0] Amana tries to distinguish ISI by pointing to the difference between promoting the sale of a company's products and promoting its name. See Liberty Sales Assoc., Inc. v. Dow Corning Corp., 816 F. Supp. 1004, 1011 (D.N.J. 1993). However, at least in the context of this case -- where Cooper sold Amana's entire product line and was Amana's sole distributor to dealers within the relevant region for 30 years -- this distinction is ephemeral.

Finally, there was additional testimony by Cooper's dealers and by Amana witnesses that strongly suggested that a "license" was present. Retail dealer Michael Napoletano, who testified for Amana, admitted that "Amana vouches for Cooper by standing behind the quality of what it sells." App. 2792. Moreover, the dealers perceived a "special relationship" between Amana and Cooper. ISI, 614 A.2d at 140 (quoting Finlay, 369 A.2d at 546). Dealers would address letters to Cooper as "Cooper Distributors, c/o Amana," App. 4101, and many dealers regarded Amana and Cooper as being "one and the same." App. 1748; see

----

[0]Cf. Cassidy, 944 F.2d at 1138 (distributor required to "use its best efforts to diligently promote the sale of [the manufacturer's products"); Neptune, 462 A.2d at 599 (distinguishing other cases where the plaintiff did not use its best efforts to promote sales).

23

also App. 1914 (testimony of a retail dealer that the dealers "always felt that Amana was sold through Cooper").

We recognize that Amana provided important evidence suggesting that it did not grant Cooper a license.  Nevertheless, taking all the evidence together, we hold that a reasonable jury could have inferred that there was a public perception that Amana vouched for Cooper's activities in relation to the Amana name.[0]

### 3.  New Jersey place of business.

The NJFPA applies only to an agreement "the performance of which contemplates or requires the franchisee to establish or maintain a place of business within the State of New Jersey." N.J.S.A. § 56:10-4.  In order to satisfy this third requirement, Cooper was required to show that the Agreement contemplated (1) that Cooper would operate a place of business ("POB") within the meaning of the NJFPA and (2) that this POB would be located in New Jersey.

---

[0] The fact that Cooper did not operate under Amana's trade name does not mandate a contrary result.  The New Jersey Supreme Court has expressly held that independently-named franchisees may still have a license from the franchisor.  As that court explained:

> [T]he inclusion of independently-named businesses is implicit in the Act's definition of franchise by the Act's limitation to a franchise "where more than 20% of the franchisee's gross sales are intended to be or are derived from such franchise."  N.J.S.A. 56:10-4(3).

ISI, 614 A.2d at 140.  "Therefore," the Court concluded, "if only a `mirror-image' relationship could constitute a franchise, the legislature would have added a superfluous requirement . . . that the franchise sales constitute twenty percent of the entire business."  Id.

24

> The NJFPA defines "place of business" as:
> a fixed geographical location at which the
> franchisee displays for sale and sells the
> franchisor's goods or offers for sale and
> sells the franchisor's services.  Place of
> business shall not mean an office, warehouse,
> a place of storage, a residence or a vehicle.

N.J.S.A. § 56:10-3(f).

Cooper maintains that its showroom/marketing center in Englewood Cliffs, New Jersey, constituted a POB.  There is ample evidence in the record that Cooper regularly used this facility for activities that were an integral part of the sales process.  For example, the record shows that this facility was often used for product demonstrations, App. 2007-08 (sales manager Nathan met once a week with customers in showroom); App. 2005 (Nathan's three salesmen each used showroom two to four times a week for demonstrations), for dealer training, App. 2006-09, and dealer open houses.  App. 690.  Amana argues, however, that this facility was not a POB because Cooper did not actually consummate sales there.  See App. 1346-1404, App. 692, App. 1231, App. 1351-52.  Relying on the statutory definition of a POB as a fixed location where "the franchisee displays for sale and sells the franchisor's goods,"  N.J.S.A. § 56:10-3(f) (emphasis added), Amana argues that the statute requires both activity leading up to the sale ("displays for sale") and the sale itself ("sells").  See Greco Steam Cleaning, Inc. v. Associated Dry Goods Corp., 608 A.2d 1010, 1013 (N.J. Super. Law Div. 1992).  Consequently, Amana argues, Cooper's showroom did not constitute a POB within the meaning of the Act.

25

We are constrained to disagree. As a federal court sitting in diversity, "we are not free to impose our own view of what state law should be; we are to apply state law as interpreted by the state's highest court." McKenna v. Pacific Rail Service, 32 F.3d 820, 825 (3d Cir. 1994). Where a state's highest court has not squarely addressed an issue, we "must be governed by a prediction of how the state's highest court would decide were it confronted with the problem." McKenna v. Ortho Pharmaceutical Corp., 622 F.2d 657, 661 (3d Cir.), cert. denied, 449 U.S. 976 (1980). Relying on ISI, we predict that the New Jersey Supreme Court would hold that Cooper's activities at its showroom/marketing center were sufficient to constitute "sales" for purposes of the NJFPA.

In ISI, the New Jersey Supreme Court, in finding that ISI's Hackensack facility was a POB, noted that ISI "ha[d] been giving more than one hundred demonstrations a year" at that facility, ISI, 614 F.2d at 138, and that ISI had used the facility to acquaint prospective purchasers with the functioning of its product. See id. The court made no mention of any actual sales at the facility but instead relied exclusively on the demonstrations and inspections -- the very same types of activities that took place at Cooper's Englewood Cliffs facility.

The New Jersey Supreme Court summarized its holding as follows:
> In short, the record sustains the trial court's finding that ISI set up a marketing facility in Hackensack where its customers, education professionals, can inspect the CCC computer system and receive a sales demonstration on the operation of its computer product. ISI's Hackensack facility

26

> thus could be found to constitute a "place of
> business" under the Act.

ISI, 614 A.2d at 138.  Based on ISI, we feel compelled to predict that the New Jersey Supreme Court, if confronted with this case, would hold that Cooper's showroom/marketing center was a POB.[0]

Apart from requiring Cooper to establish that the showroom was a POB, the statute also obligated Cooper to show that the parties contemplated or required that the POB be located in New Jersey.  See N.J.S.A. § 56:10-4; see also Finlay, 369 A.2d at 545.  The ISI court explained that "a franchise would be governed by the Act whether the contract required a place of business in New Jersey or whether the parties reasonably anticipated that the franchisee would establish a New Jersey place of business."  ISI, 614 A.2d at 136.

We hold that a reasonable jury could have found that the parties "reasonably anticipated" that Cooper would establish a New Jersey POB.  Throughout its 31-year relationship with Amana, Cooper had its showrooms in New Jersey, first in Newark and then in Englewood Cliffs.  App. 683-701.  When Amana expanded Cooper's New York sales territory in 1982, Cooper declined to purchase Amana's Long Island facility, telling Amana that it was a New Jersey-based firm and would not "split [the] operation."  App. 683.  Even Amana conceded that it "knew that Cooper's business was located in New Jersey."  Appellant's Brief at 32.

---

[0]Cooper argues that a reasonable jury could have found that actual order taking occurred at the showroom.  Since we hold that a POB exists even without order taking, we need not discuss this question.

27

Consequently, when the parties entered into the 1990 Agreement, these facts were more than enough to create a reasonable anticipation that Cooper would continue to have a POB in New Jersey during the life of the new Agreement. See ISI, 614 A.2d at 136-37 (finding that a 1984 agreement contemplated a New Jersey POB because, in part, ISI had operated a marketing facility in New Jersey since 1977); Liberty, 806 F. Supp. at 1008 (New Jersey location when first contracting with supplier is enough to give rise to inference of anticipation of New Jersey location).[0]

In sum, we hold that a reasonable jury could have concluded (1) that Cooper and Amana had a "community of interest," (2) that Amana granted Cooper a "license," and (3) that Cooper established a New Jersey POB. Therefore, a reasonable jury could have found that Cooper had a franchise within the meaning of the Act. Accordingly, we affirm the district court's denial of Amana's motion for judgment as a matter of law on Cooper's NJFPA claim.

    B.  Jury Instructions

---

[0] Amana also argues that the ISI court, by suggesting that ISI could not sell its product without its facility, see ISI, 614 A.2d at 138, implicitly held that a facility cannot constitute a POB unless the facility is necessary for the plaintiff's business. A reasonable jury could have concluded, however, that Cooper's showroom was necessary to its business since there was evidence that the showroom was used for "important" demonstrations, App. 1231, and for "vital" sales training. App. 834.

28

Amana contends that, even if it was not entitled to judgment as a matter of law on Cooper's NJFPA claim, it was at least entitled to a new trial due to the district court's allegedly erroneous jury instructions. We review the district court's instructions to determine "whether the charge, taken as a whole and viewed in light of the evidence, fairly and adequately submit[ted] the issues in the case to the jury." Limbach Co. v. Sheet Metal Workers Intern. Ass'n, 949 F.2d 1241, 1259 n.15 (3d Cir. 1991) (quoting Link v. Mercedes-Benz of North America, Inc., 788 F.2d 918, 922 (3d Cir. 1986)). We grant a new trial "only if the instruction was capable of confusing and thereby misleading the jury." Link, 788 F.2d at 922. When reviewing instructions, we consider "the totality of the instructions and not a particular sentence or paragraph in isolation." In re Braen, 900 F.2d 621, 626 (3d Cir. 1990), cert. denied, 498 U.S. 1066 (1991). Amana contends that the court gave improper instructions on each of the three franchise requirements.

1. Community of interest.

The district court denied Amana's request for several jury instructions regarding community of interest. First, it refused to give the following instruction:

> The fact that other brands or lines . . . may or may not presently be available for distribution by Cooper Distributing is not relevant to the issue of whether or not a community of interest existed between Amana and Cooper Distributing in the marketing of Amana products.

29

App. 351.  Amana contends that Cooper was unable to find another product line to distribute due to market changes and that these changes could not convert Cooper's assets into franchise-specific assets.  Amana argues that the above instruction should have been given to ensure that the jury understood this point.

Without deciding whether Amana's argument regarding the effect of market changes under the NJFPA is correct, we hold that the district court's detailed and accurate community-of-interest charge (see App. 3901-05) taken as a whole was not capable of confusing the jury.  Not only did this instruction provide a clear and correct general description of this concept and the concept of franchise-specific assets, but the three specific types of investments that the instruction mentioned -- goodwill, product-specific knowledge, and inventory -- are not types of investments that could easily become non-transferable due to market changes.  The court told the jury that franchise-specific assets in this case might include:

> [B]usiness goodwill developed by Cooper with its customers associated with using Amana's name or built up by significant advertising, marketing, or promotional efforts with respect to Amana home appliances and not able to be transferred or utilized by Cooper outside of the relationship with Amana; . . . and any skill or knowledge Cooper gained in the marketing of Amana's home appliances which could not be used in selling other brands of home appliances, even if lines of appliances other than Amana were available to Cooper.

App. 3905 (emphasis added).  Thus, looking at the instructions as a whole, we do not think that they were capable of leading the

jury into believing that assets rendered non-transferable merely by market changes could contribute to a finding of franchise-specificity.

Second, the district court denied Amana's request for an instruction asking the jury to "consider whether the written contracts between Amana and Cooper Distributing required Cooper Distributing to direct all of its energy and resources to developing demand for Amana products." App. 369 (emphasis added). The district court did not err in refusing to give this instruction because Cooper, in order to prove a community of interest, was not required to show that it directed all of its energy and resources to promoting the sale of Amana products. See N.J.S.A. § 56:10-4 (minimum of 20% of gross sales must be from franchisor); New Jersey American, 875 F.2d at 63 (noting that "a firm may be considered a franchisee even if only 21% of its gross sales are derived from the franchisor").[0]

2. License.

Amana argues that the district court erred in denying three requested jury instructions on the subject of whether Amana created a license. First, Amana contends that the court should have given a charge stating that, in determining whether Cooper had a "license" at the time of termination, the jury should not

_____

[0]The court also denied Amana's request for an instruction asking the jury to consider whether "the dealers to whom Cooper Distributing sold Amana products sold not only Amana but also other brands of appliances." App. 376. We do not think that this instruction had a bearing on whether Amana and Cooper had a community of interests and we consequently hold that the district court's failure to give this instruction was not erroneous.

31

consider certain practices that Cooper had already by this time abandoned, such as its previous practices (see App. 749-50) of performing in-home repair service on Amana appliances while displaying the Amana logo on its truck. See App. 318. We disagree. As previously noted, the New Jersey Supreme Court has explained that "the term `license' means that the alleged franchisee must use the name of the franchisor `in such a manner as to create a reasonable belief on the part of the consuming public that there is a connection between the . . . licensor and licensee by which the licensor vouches, as it were, for the activity of the licensee.'" ISI, 614 A.2d at 139 (citation omitted). Cooper's past practices could be regarded as contributing to the public's perception of the relationship between Cooper and Amana. We therefore hold the district court's denial of Amana's requested instruction was not erroneous.

Second, Amana contends that the district court erred in refusing to give an instruction asking the jury to consider whether Amana's products were "`off-the-shelf' type products that [could] be purchased at regular business outlets (such as appliance stores)." App. 322. We hold, however, that the district court's "license" charge as a whole was not capable of confusing the jury. This instruction was based squarely on ISI. See App. 3899. Under the NJFPA, the distinction between "off-the-shelf" products and others is not of such critical significance that a specific instruction on this point was essential.

32

Third, Amana argues that the district court erred in denying its request for an instruction asking the jury to consider whether the Agreement required Cooper to use its best efforts to promote Amana's name, as opposed to Amana's products. App. 329-330. As previously noted, however, we view the distinction between the promotion of the Amana name and the promotion of Amana products to be of little substance in the context of this case. See supra page 22.

### 3. Place of Business.

> The district court gave the following POB instruction: A place of business is defined as "a fixed geographical location at which the franchisee displays for sale and sells the franchisor's services."
>
> . . .
>
> To meet the place of business requirement, . . . it is not necessary that the sale of goods include only order taking at the location. Using the location for display and demonstration of the franchisor's goods to prospective customers is sufficient.

App. 3899. Amana contends that this charge was inaccurate, but we find Amana's argument to be without merit. As noted, we predict that the New Jersey Supreme Court would hold that the actual taking of orders is not necessary and that demonstrations are sufficient in order to find a POB. See supra pages 24-26.

In summary, we hold that the trial court did not err in denying Amana's motion for judgment as a matter of law or its motion for a new trial on Cooper's NJFPA claim. We thus turn to the question of damages.

C.   NJFPA Damages

The jury awarded Cooper $4.375 million in damages under the NJFPA.  App. 4794.  Amana requests a new trial on damages, arguing that the district court erred in upholding the verdict. Amana claims that the verdict was against the great weight of the evidence because the jury based its damages award on the false assumption that Cooper had a contractual right in the four-state territory to be Amana's exclusive distributor to retail dealers. App. 4954.  Because we agree that Cooper had no such right and because we additionally hold that the franchise was valued as of the wrong date, we remand for a new trial on damages.

We are mindful that our scope of review of a damages award is "exceedingly narrow."  Williams v. Martin Marietta Alumina, Inc., 817 F.2d 1030, 1038 (3d Cir. 1987) (quoting Walters v. Mintec/International, 758 F.2d 73, 80 (3d Cir. 1985). The district court's refusal to grant a new trial is reviewed for abuse of discretion.  See Frank Arnold Contractors, Inc. v. Vilsmeier Auction Co., Inc., 806 F.2d 462, 465 (3d Cir. 1986). We will reverse, however, when "the verdict is contrary to the great weight of the evidence, thus making a new trial necessary to prevent a miscarriage of justice."  Roebuck v. Drexel, 852 F.2d 715, 736 (3d Cir. 1988).

In the current case, Cooper's valuation expert, Melvin Konner, in calculating the value of the Cooper franchise, assumed that Cooper had an exclusive right to sell to the retail dealers in its four-state territory and "that Amana had no right to sell

34

[to the dealers] direct[ly.]" App. 1841. Furthermore, Konner explained that his calculation of the value of the Cooper franchise would have been "considerably less" if "Amana did have the right to sell directly" to the dealers. App. 18. The jury's award appears to have been based on Konner's estimate. As will be discussed below, however, see infra p. 36-42, Amana did not grant Cooper the exclusive right to sell to the retail dealers, and therefore Konner's assumption was incorrect. Consequently, we hold that the jury's verdict was against the great weight of the evidence, and we therefore remand for a new trial on NJFPA damages.

We also find that the Cooper franchise was valued as of the wrong date. The district court instructed the jury to value the franchise as of November 5, 1991, the date that Amana attempted to terminate the franchise, App. 2917, and Konner likewise calculated Cooper's value as that date. App. 1780. However, as a result of the preliminary injunction entered by the district court, Cooper continued to operate its franchise until the date of judgment, March 8, 1994, which was also the date on which the district court dissolved the preliminary injunction. App. 5000-02. Although Amana unquestionably attempted to terminate the Cooper franchise on November 5, 1991, the franchise was not effectively terminated until the dissolution of the preliminary injunction on March 8, 1994, since Cooper continued to operate and receive profits from the franchise until that latter date. We therefore hold that the franchise should have

35

been valued as of that date, when Cooper actually stopped running the franchise.

Valuing the franchise as of the earlier date would bestow a double recovery on Cooper. When franchises are valued, the "price should be approximately equal to the present value of all income that can be derived far into the future from the business." Johnson v. Oroweat, 785 F.2d 503, 507 (4th Cir. 1986). This incorporation of future earnings into the current value of a business explains "why courts allow a plaintiff to recover either the present value of lost future earnings or the present market value of the lost business, but not both." Id. at 508; see also Arnott v. American Oil Co., 609 F.2d 873, 886 (8th Cir. 1979) ("[I]t is improper to permit a plaintiff . . . to recover both the value of the business as a going concern . . . and future profits of that business . . . . Future profit potential is taken into consideration in valuing the business as a going concern."), cert. denied, 446 U.S. 981 (1980). Consequently, valuing the Cooper franchise as of November 5, 1991, would give rise to a double recovery because Cooper would receive both (1) the value of the franchise as of the earlier date -- (which would include the present value of the future earnings from that date to the date of judgment)[0] and (2) the actual profits derived from the franchise between the date of the attempted termination and the date of judgment. To avoid this

---

[0]See App. 1799 (valuation expert Konner predicting "how [the] business [was] going to do" after 1991).

36

double recovery, we conclude that the proper date of valuation in this case is March 8, 1994.[0]

## III. CONTRACT CLAIM

We now turn to Cooper's breach of contract claim. In the early summer of 1991, a few months before the attempted termination, Amana began selling products directly to P.C. Richard, Cooper's largest dealer, App. 2309-13,[0] and other local dealers. Cooper asserted that the Agreement prohibited Amana from selling directly to such dealers in Cooper's territory and that therefore Amana was in breach. The district court, after concluding that the Agreement was ambiguous as to Amana's right to make direct sales in Cooper's territory, App. 170-71, submitted the contract interpretation issue to the jury. The court instructed the jury to consider course of dealing and course of performance evidence in determining whether Amana had the right to make such sales. App. 3909-10. Apparently relying

---

[0] The New Jersey Supreme Court's decision in Westfield Centre Services, Inc. v. Cities Service Oil Co., 432 A.2d 48 (N.J. 1981), does not mandate a contrary result. In its opinion in that case, the court observed that where a franchisor violates the NJFPA but is motivated by good faith business reasons, the franchisee's damages "should be measured . . . in terms of the actual or reasonable value of the franchisee's business when the franchisor cuts off the franchise." 432 A.2d at 55. In the current case, Cooper's franchise should be viewed as having been effectively "cut[] off" when the preliminary injunction was vacated.

[0] P.C. Richard, a local dealer, was an annual purchaser of $6 million of Amana products, representing one-third of Cooper's total Amana business and 60% of Cooper's New York Amana sales. App. 910, 1014-16, 3955.

on such evidence,[0] the jury concluded that Amana did not reserve the right to sell to dealers in Cooper's region and awarded Cooper $2 million for Amana's breach. Amana maintains that the district court committed reversible error in concluding that the contract was ambiguous and in submitting the question of contract interpretation to the jury. We agree.

The Agreement provides that any disputes under the Agreement are "subject to [the] laws of the State of Iowa." App. 3982. Under Iowa law, the test for ambiguity is an objective one: "whether the language is fairly susceptible to two or more different meanings." PMX Industries, Inc. v. LEP Profit Intern., 31 F.3d 701, 703 (8th Cir. 1994) (citing Iowa Fuel & Minerals, Inc. v. Iowa State Bd. of Regents, 471 N.W.2d 859, 862–63 (Iowa 1991)); see also Taylor v. Continental, 933 F.2d 1227, 1232 (3d Cir. 1991) ("A term is ambiguous if it is susceptible to reasonable interpretations."). Furthermore, where a "written contract is unambiguous, Iowa law does not allow consideration of extrinsic evidence." PMX Industries, Inc. v. LEP Profit International, 31 F.3d 701, 703 (8th Cir. 1994); see also Iowa Fuel, 471 F.2d at 862 (parties' intent determined by the words of the contract); Anderson v. Aspelmeier, Fisch, Power, Warner, & Engberg, 461 N.W.2d 598, 600 (Iowa 1990) (extrinsic evidence may

---

[0] See, e.g., App. 988 (testimony from Cooper's president and general manager, William Cooper, that, except for Amana's sales to the national accounts, Cooper had been the exclusive dealer for 30 years); App. 994 (announcement from Amana to the retail dealers in Cooper's area that Cooper was "the exclusive distributor of Amana's domestic appliances" in that region); App. 3379–80 (testimony that Amana repeatedly told Cooper that Cooper had an exclusive sales territory).

38

not be used to modify, enlarge, or curtail the contract terms).[0] While extrinsic evidence, such as the course of performance evidence submitted to the jury in this case, may be admissible to "supplement[] or explain[]" the terms of the agreement, it cannot be used to contradict unambiguous terms. Ralph's Distributing Co. v. AMF, Inc., 667 F.2d 670, 673 (8th Cir. 1981). The decision whether a contract is ambiguous is one for the court to decide as a matter of law, see Boge v. State of Iowa, 309 N.W.2d 8, 430 (Iowa 1981), and therefore our review is plenary.

We hold that the language of the Agreement between Amana and Cooper unambiguously provided for a non-exclusive distributorship arrangement and therefore that the district court erred in submitting to the jury the question of whether Amana reserved the right to sell directly to dealers in Cooper's territory. One provision of the Agreement states:

---

[0] The Iowa Supreme Court has not addressed the question whether the Uniform Commercial Code (UCC) applies to distributorship agreements under Iowa law. However, In Corenswet, Inc. v. Amana Refrigeration, Inc., 594 F.2d 129 (5th Cir.), cert. denied, 444 U.S. 938 (1979), the Fifth Circuit applied the UCC to a distributorship under Iowa law, explaining:

> Although most distributorship agreements . . . are more than sales contracts, the courts have not hesitated to apply the Uniform Commercial Code to cases involving such agreements.

Id. at 132 (citations omitted); see also Ralph's Distributing Co. v. AMF, Inc., 667 F.2d 670, 673 n.6 (8th Cir. 1981) (following Corenswet).

Assuming that the Iowa courts would apply the Iowa version of the UCC in this case, the result would not be affected. Under Iowa Code § 554.2202, the express terms of the Agreement could not be contradicted by contrary course-of-dealing evidence.

> [T]he Distributor [Cooper] shall have <u>the
> non-exclusive right</u> to purchase from Amana
> for resale . . . .

App. 3979 (emphasis added).

> Another even more specific provision states:

> Amana reserves the right to make sales
> <u>directly</u> or through other channels of
> distribution <u>including, but not limited to,</u>
> sales: (a) to any national, state or local
> government, or any agency or subdivision
> thereof; (b) for export; (c) to another
> manufacturer, (d) under trademarks other than
> Amana such as products manufactured under
> private label, (e) for commercial use; (f) to
> national accounts; (g) to general
> contractors, sub-contractors, builder
> distributor/dealers or developers of business
> or home building projects; (h) to leasing
> and/or rental accounts. Any sales under this
> provision may be made by Amana without
> notice, compensation or other obligation of
> any kind to Distributor.

App. 3981 (emphasis added).

In arguing that this provision is ambiguous, Cooper relies on the fact that sales by Amana to local retailers, such as P.C. Richard, are not specifically mentioned in the list contained in the provision. But since this list is prefaced by the phrase "including but not limited to," this argument is unconvincing. The list merely gives examples of entities with whom Amana reserved "the right to make sales directly." By using the phrase "including, but not limited to," the parties unambiguously stated that the list was not exhaustive. <u>See Foods, Inc. v. Iowa Civil Rights Comm'n</u>, 318 N.W.2d 162, 171 (Iowa 1982) (noting that the "including, but not limited to" language created a considerably discretionary standard); <u>In re</u>

40

Forfeiture of $5,264, 439 N.W.2d 246, 251 n.7 (Mich. 1989) (inferring a broad construction from use of the "including, but not limited to" language); Jackson v. O'Leary, 689 F. Supp. 846, 849 (N.D. Ill. 1988) (noting that the phrase "including, but not limited to" is "the classic language of totally unrestricted (and hence totally discretionary) standards").

Cooper's contention that our interpretation of the contract noted above should be governed by the rule of ejusdem generis is unpersuasive. Under this rule of construction, general words near a specific list are "not to be construed to their widest extent, but are to be held as applying only to . . . things of the same general kind . . . as those specifically [listed]." Black's Law Dictionary, 464 (5th ed. 1979); see also In re Syverson's Estate, 32 N.W.2d 799, 804 (Iowa 1948); Attorney General v. Blue Cross & Blue Shield of Michigan, 4 N.W.2d 54, 58 (Mich. Ct. App. 1988). Assuming that sales to retail dealers are not of the same general kind as the other transactions listed in the Agreement, Cooper contends that we should infer that Amana cannot make such direct sales. But the rule of ejusdem generis applies only if the provision in question does not express a contrary intent. See In re Syverson's Estate, 32 N.W.2d at 804; Blue Cross, 4 N.W.2d at 58. Thus, since the phrase "including, but not limited to" plainly expresses a contrary intent, the doctrine of ejusdem generis is inapplicable. See In re Forfeiture of $5,264, 439 N.W.2d at 251 n.7 (noting that the rule of ejusdem generis did not apply because the proviso contained the "including, but not limited to" language); Ramirez, Leal &

41

Co. v. City Demonstration Agency, 549 F.2d 87, 104 (9th Cir. 1976) (explaining that "including, but not limited to" language is "often used to mitigate" the rule of ejusdem generis); Blue Cross, 4 N.W.2d at 58.

In an effort to support its argument, Cooper cites other cases involving contractual language which, according to Cooper, withheld exclusive distributorship rights in language that was even clearer than that in the Agreement at issue here. This argument, however, misses the mark. The question is not whether the Agreement could have been even more emphatic, but rather whether the language of the Agreement is susceptible to more than one reasonable interpretation. Since we hold that the language is unambiguous, it is irrelevant whether even more forceful language might have been possible. See PMX, 31 F.3d at 703. Accordingly, we hold that the Agreement unambiguously permitted Amana to make any direct sales it wished and that the introduction of contradictory extrinsic evidence in this regard was impermissible.[0] We therefore reverse the judgment entered in

---

[0] Ralph's Distributing Co. v. AMF, Inc., 667 F.2d 670 (8th Cir. 1981), is not to the contrary. There, Ralph's Distributing Company, a wholesale distributor of snowmobiles, sued AMF, a snowmobile manufacturer that had entered into a franchise agreement with Ralph's. Pursuant to the agreement, Ralph's was to buy the snowmobiles directly from AMF and then resell them to retail dealers in its designated territory. When AMF began to sell directly to the retail dealers in Ralph's territory, Ralph's sued for breach of contract, alleging that AMF's direct sales in Ralph's territory violated Ralph's contractual right to be the exclusive distributor. Interpreting Iowa law, the Eighth Circuit considered extrinsic evidence in interpreting the contract. Ralph's is distinguishable from the current case, however, because "the contracts designating Ralph's sales area [were] silent as to whether or not it would be the exclusive [AMF

42

favor of Cooper on its breach of contract claim and remand for the entry of judgment in favor of Amana on this claim.[0]

IV.  TORTIOUS INTERFERENCE WITH PROSPECTIVE
BUSINESS ADVANTAGE

The jury found for Cooper on its claim for tortious interference with prospective business advantage, App. 4795-96, but the jury did not award any actual damages on this claim.  Id. The jury did, however, award $3 million in punitive damages.  Id. As the district court explained to the jury, Cooper's tortious interference claim was the only claim on which punitive damages were available.  App. 3921.

Under New Jersey law, the elements of a claim for tortious interference with prospective business advantage are as follows:  1) a prospective economic relationship from which the plaintiff has a reasonable expectation of gain; 2) intentional and unjustifiable interference with that expectation, and 3) a causative relationship between the interference and the loss of the prospective gain.  See Printing Mart-Morristown v. Sharp Electronics Corp., 563 A.2d 31, 37 (N.J. 1989).

---

snowmobile] distributor in that territory."  Ralph's, 667 F.2d at 673.

[0]Amana argued that the judgment in favor of Cooper on the breach of contract claim should be reversed in whole or in part, for two additional reasons:  (1) because the district court allegedly gave incorrect jury instructions and (2) because Cooper's contract damages were duplicative of its recovery under the NJFPA.  Because we hold, for the reasons explained above, that Amana is entitled to judgment on Cooper's breach of contract claim, we need not reach either of these arguments.

43

Cooper based its tortious interference claim on two independent sets of alleged facts: (1) Amana's sale of products directly to P.C. Richard and (2) other conduct in which Amana engaged <u>after</u> the district court preliminarily enjoined Amana from terminating the Cooper franchise.[0] App. 3912-13. The jury returned a verdict for Cooper on both bases,[0] App. 4795-96, and the district court entered judgment in accordance with the verdict. App. 5703-11.

Assuming arguendo that there was legally sufficient evidence to support the jury's finding of tortious interference, Amana contends that the award of $3 million in punitive damages must be reversed because the jury, by awarding $0 in actual damages, found that Cooper suffered no injury. We agree with Amana's argument.

Under New Jersey law, a plaintiff must suffer some injury in order to recover punitive damages. See <u>Nappe v. Anschelewitz, Barr, Ansell & Bonello</u>, 477 A.2d 1224, 1232 (N.J. 1984) ("[P]unitive damages may be assessed . . . where <u>some</u> <u>injury, loss, or detriment to the plaintiff has occurred</u>.") (emphasis in original); <u>Lightning Lube, Inc. v. Witco Corp.</u>, 4 F.3d 1153, 1195 (3d Cir. 1993). Despite the jury's finding of $0

---

[0] For example, Cooper offered evidence that was intended to prove that, after the preliminary injunction, Amana intentionally delayed approval of an air conditioner sales program between Cooper and one of its largest dealers, Trader Horn. App. 1047-61; <u>see also</u> App. 1067-73 (evidence that Amana dropped Cooper from its mailing list and thus left Cooper unaware of discounts and model changes).

[0] In light of our prior discussion concerning Cooper's breach of contract claim, the punitive damage claim could not be sustained based on the first theory set out above.

in actual damages, Cooper makes two arguments that it did suffer injury and that punitive damages were therefore permitted. First, Cooper claims that the finding of harm necessary to an award of punitive damages need not be monetarily measurable but can be intangible or unquantifiable. Second, it claims that the jury "molded" the breach of contract verdict with the tortious interference verdict and that we should infer that the jury did award some actual damages for Amana's tortious interference.

As for Cooper's argument that it suffered intangible injury and was therefore entitled to a punitive award, the New Jersey Supreme Court has explained that a plaintiff need not show injury which gives rise to compensatory damages in order to receive punitive damages. See Nappe, 477 A.2d at 1231-32. The question we must answer is whether Cooper may recover punitive damages in the absence of an award of even nominal damages.

In Lightning Lube, we considered whether Lightning Lube, a lube oil dealer, could recover punitive damages from Witco, an oil equipment supplier, on Lightning Lube's fraud and misrepresentation claim where the jury found that the plaintiff had sustained no damages. We held that in light of the jury's refusal to award nominal damages to the plaintiff, we could infer that the plaintiff did not suffer sufficient injury to warrant an award of punitive damages. We explained:

> Inasmuch as the jury did not find sufficient injury to award nominal damages on this claim, the . . . fraud cannot sustain an award of punitive damages.

45

_Lightning Lube_, 4 F.3d at 1195. Relying on _Lightning Lube_, Amana contends that because the jury did not find sufficient injury to award even nominal damages to Cooper, the tortious interference claim cannot sustain a punitive award.

The district court rejected Amana's argument by seeking to distinguish _Lightning Lube_. App. 5708. Whereas neither party in the current case requested a nominal damages instruction, the jury charge in _Lightning Lube_ contained the following instruction:

> If you find that the defendant has violated the legal rights of the plaintiff in accordance with the law upon which I have instructed you, and if you find that the plaintiff has proven it has sustained damages but they are not computable, you may enter an award of nominal damages.

App. 5708 (district court citing _Lightning Lube_ jury instructions). Based upon this instruction, it was clear that "the jury knew to award nominal damages expressly if it desired to do so," _Lightning Lube_, 4 F.3d at 1195, and therefore the jury's failure to award nominal damages in that case implied that the jury did not find any injury. In the current case, the district court noted, no instructions on nominal damages were sought or given, and the district court therefore opined that the jury's finding of $0 in damages on Cooper's tortious interference claim could "not be read to imply a finding that Cooper had suffered no damages as result of Amana's tortious interference." App. 5710. In addition, the district court stated that it could be inferred that the jury found that Cooper suffered actual harm

because the jury awarded punitive damages after being instructed that such damages could not be awarded unless "some harm to the plaintiff has occurred, even if intangible or unquantifiable." App. 3922. Therefore, the district court held that the jury found that Cooper did suffer sufficient injury to warrant punitive damages.

We find the district court's reasoning unconvincing. Much like the jury in this case, the Lightning Lube jury was instructed that it could award punitive damages only if the "defendant ha[d] committed fraud or misrepresentation which had caused plaintiff damage." App. 5721 (emphasis added). Yet despite this instruction, we held that the jury's punitive damages award was improper because the jury there, as here, awarded $0 in actual damages. Thus, the mere fact that the punitive damages instructions in this case required a finding of actual harm is insufficient to sustain the punitive damages award.

Moreover, we do not think that the fact that "the Lightning Lube jury was specifically made aware of the availability of nominal damages," App. 5708, can justify a contrary result. We decline to accept Cooper's invitation to place the burden on the defendant to request a nominal damages instruction. Cooper was the party seeking a finding of actual injury and, as such, bore the responsibility of requesting a nominal damages instruction if it wanted the jury to consider that option. Of course, Cooper may well have decided for tactical reasons that it did not want the jury to consider that

47

option.  But whether Cooper failed to request an instruction on nominal damages by choice or inadvertence, it should bear the consequences.  Because Cooper did not request such an instruction, it cannot now contend that we should infer a finding of nominal damages.  See  Walker v. Anderson Electrical Connectors, 944 F.2d 841, 844-45 (11th Cir. 1991) (holding that plaintiff was not entitled to a presumption of nominal damages when she had failed to request them), cert. denied, 113 S. Ct. 1043 (1993);[0] Sims v. Mulcahy, 902 F.2d 524, 535 (7th Cir.), cert. denied, 498 U.S. 897 (1990).[0]

We next address Cooper's contention that the jury "molded" the $0 tortious interference verdict with the $2 million breach of contract verdict and in fact awarded substantial compensatory damages on the tortious interference claim.  Cooper maintains that because there was evidence in the record that Cooper lost $1,959,000 as a result of Amana's direct sales to

[0]The Eleventh Circuit in Walker suggested that the reason that it placed the burden of such a request on the plaintiff was because she had something to gain by its absence.  The court, quoting the defendant's brief, noted that:

> [i]f there had been an instruction . . . on nominal damages, the jury might have given it, and that was a risk to be avoided by the plaintiff since she was after substantial money.

Walker, 944 F.2d at 845 n.7.

[0]Cooper's reliance on Singer Shop-Rite, Inc. v. Rangel, 416 A.2d 965, 968 (N.J. Super. Ct. App. Div.), certif. denied, 425 A.2d 299 (N.J. 1980), is misplaced since Rangel explained that punitive damages will be upheld "where actual damage has been shown to accrue from the tortious act."

P.C. Richard, App. 4607, and because there was evidence in the record that Cooper lost $41,000 as a result of Amana's allegedly tortious post-injunction conduct, App. 4611, we should infer that the jury's $2 million breach of contract award was really a "molding" of its breach of contract verdict and its tortious interference verdict.

In support of its argument, Cooper relies on Universal Computers (Systems) Ltd. v. Datamedia Corp., 653 F. Supp. 518 (D.N.J.), aff'd, 838 F.2d 1208 (3d Cir. 1988) (no published opinion). In Datamedia, the jury found for the plaintiff on several theories, one of which, fraud, could have supported an award of punitive damages. The jury, however, did not fill in the damages line on its special verdict form for any of the theories except the first one and instead left the line next to all the remaining theories, including fraud, blank. See id. at 532-34. Concluding that the jury had misunderstood the verdict form and had aggregated all the damages on a single line, the district court held that in actuality the jury had awarded actual damages for fraud and that the award of punitive damages could be upheld. See id. at 530. Of course, Datamedia is not binding on us and, even if it were, it would be inapplicable here. In this case, the jury did not leave a blank next to the line for tortious interference; instead the jury wrote "$0." App. 4795-96. In the face of such an express finding of $0 damages, we refuse to infer that the jury "molded" its verdict and in fact awarded actual damages for tortious interference.

49

This result is buttressed by the fact that the sum total of Cooper's alleged losses from its contract claim combined with Cooper's alleged losses from its tortious interference claim do not really equal $2 million, as Cooper erroneously suggests. Although there was evidence in the record that Cooper lost $1,959,000 as a result of Amana's direct sales to just P.C. Richard, App. 4607, there was also evidence in the record that Cooper lost $2,001,000 as a result of Amana's direct sales to all of Cooper's local retail dealers (i.e., P.C. Richard plus the other local retailers). App. 4606. Since the breach of contract verdict question on the special verdict form asked the jury to consider Amana's direct sales "to P.C. Richard and other dealers," App. 4794 (emphasis added), the facts do not support Cooper's inventive theory that the jury aggregated Cooper's claimed breach of contract damages with Cooper's claimed tortious interference damages. Accordingly, we hold that, pursuant to the jury's verdict, Cooper suffered no actual harm as a result of the tortious interference claim, and we therefore reverse the district court's entry of the $3 million judgment for punitive damages in favor of Cooper and remand for the entry of a judgment of $0.[0]

V. PREJUDGMENT INTEREST

---

[0] Consequently, we need not address Amana's two alternative arguments (1) that the punitive damages did not bear a reasonable relationship to the actual damages and (2) that Cooper failed to prove that Amana acted with the malice necessary to warrant punitive damages.

50

Last, we turn to Cooper's cross-appeal and its contention that it was entitled to prejudgment interest on its NJFPA award. Applying New Jersey law, the district court denied prejudgment interest because "the injunction barring Amana from terminating Cooper precludes Cooper from convincingly arguing that it was denied the use of the value of its own business." App. 5739 n.2. We agree with this holding,[0] and we therefore affirm.

On appeal, Cooper argues that it is entitled to prejudgment interest on its NJFPA claim no matter whether that claim sounds in contract or tort. In our view, however, Cooper is not entitled to prejudgment interest in either event. If the NJFPA claim is analogized to a contract claim under New Jersey law, the award of prejudgment interest for claims arising in contract is subject to the discretion of the trial court. See Meshinsky v. Nichols Yacht Sales, Inc., 541 A.2d 1063, 1070 (N.J. 1988). Traditionally, prejudgment interest was awarded in contract cases only on liquidated damages. See George H. Swatek, Inc. v. North Star Graphics, Inc., 587 A.2d 629, 632 (N.J. Super. Ct. App. Div. 1991) (noting that historically, prejudgment interest was not awarded "where a . . . substantial controversy

_____

[0] Cooper contends on appeal that, pursuant to the Agreement, Iowa law should govern. However, since Cooper argued to the district court that "New Jersey's approach to prejudgment interest governs the franchise claim," App. 5193, we hold that Cooper failed to raise the argument that Iowa law should govern the prejudgment interest claim to the district court and that Cooper therefore cannot raise the argument for the first time on appeal. See Harris v. City of Philadelphia, 35 F.3d 840, 845 (3d Cir. 1994) (declining to address a claim raised for the first time on appeal).

51

exist[ed] as to the amount due under a contract"). The rationale was that "the person who is liable for the debt does not know the sum he owes and cannot be in default until the amount he owes is determined by judgment." Preston v. Claridge Hotel & Casino Ltd., 555 A.2d 12, 16 (N.J. Super. Ct. App. Div. 1989). However, "the rule that limited prejudgment interest awards to cases where damages were liquidated or clearly ascertainable in advance has been significantly eroded." Meshinsky v. Nichols Yacht Sales, Inc., 541 A.2d 1063, 1070 (N.J. 1988); see also Swatek, 587 A.2d at 633 (prejudgment interest can be awarded "whether either liquidated or unliquidated damages are recovered"). Today, the purpose of an award of prejudgment interest is "to indemnify the claimant for the loss of what the moneys due him would presumably have earned if the payment had not been delayed." Ellmex Construction Co., Inc. v. Republic Insurance Co., 494 A.2d 339, 349 (N.J. Super. Ct. App. Div. 1985), certif. denied, 511 A.2d 639 (N.J. 1986). As the New Jersey Supreme Court explained, "[t]he basic consideration is that the defendant has had the use, and the plaintiff has not, of the amount in question." Rova Farms Resort, Inc. v. Investors Insurance Co. of America, 323 A.2d 495, 512 (N.J. 1974).

In the current case, at no time prior to the judgment did Amana have the use of Cooper's property. We explained above that, due to the operation of the preliminary injunction, Cooper's franchise was not effectively terminated until the date of the court's dissolution of the preliminary injunction when the judgment was entered, see supra p. 35, and that, for practical

52

purposes, Cooper had the use of its franchise until that date. Consequently, at no time prior to judgment did Amana have the use of something of value owned by Cooper, and we therefore hold that the district court acted within its discretion by rejecting Cooper's request for NJFPA prejudgment interest predicated on a contract-based theory.

Cooper makes the alternative argument that its NJFPA claim should be considered to be in tort and, as such, should give rise to prejudgment interest pursuant to New Jersey Court Rule 4:-11(b), which provides for prejudgment interest on tort claims. We hold that the fact that Cooper was not denied the use of its property until judgment precludes Cooper from receiving prejudgment interest even if Cooper's NJFPA claim is viewed as sounding in tort. Since Cooper's franchise existed until the date of judgment, we affirm the district court's holding that Cooper was not entitled to prejudgment interest.[0]

## VI. CONCLUSION

For the reasons explained above, we affirm the district court's denial of Amana's motion for a judgment as a matter of law and its motion for a new trial on the NJFPA claim. We reverse the district court's denial of a new trial on NJFPA

---

[0] Alternatively, Cooper claims that the district court erred by failing to award Cooper prejudgment interest in light of Amana's alleged aggravated misconduct. See W.A. Wright, Inc. v. KDI Sylvan Pools, Inc., 746 F.2d 215, 219 (3d Cir. 1984) (egregious conduct warranted prejudgment interest). Again, however, we decline to award prejudgment interest where the plaintiff was not deprived of the use of his property until judgment.

53

damages and remand for a new trial on that issue consistent with this opinion.  We reverse the judgment in favor of Cooper on its breach of contract claim and remand for the entry of judgment for Amana on that claim.  We reverse the award of $3 million in punitive damages to Cooper on its tortious interference claim and remand for the entry of a judgment for $0.  We affirm the district court's denial of Cooper's motion for prejudgment interest.  Each side will bear its own costs.[0]

---

[0]While a sharing of costs often follows a decision in which each side has prevailed on one or more issues, in this case we take the occasion to note that even if Cooper had prevailed, we might not have awarded it costs because of the excessiveness of the footnotes in its otherwise helpful and persuasive brief. This court's local rules explicitly state that "excessive footnotes in briefs are discouraged."  See LAR 32.2(a).  The effect was not only to make the brief more difficult to read, but it meant that many pages contained more than the 27 lines of double-space text permissible under LAR 32.1(c).

Cooper Distributing Company v. Amana Refrigeration, Inc.

Nos. 94-5569 and 94-5570


SLOVITER, Chief Judge, concurring and dissenting.

I am happy to join the majority's careful and persuasive opinion in all r
except one:  although I believe it is a close question, I cannot agree that the
Distributor Agreement unambiguously permitted Amana to sell directly to all dealers
Cooper's territory.  I believe that the district court did not err in determining t
distributorship agreement between Amana and Cooper was ambiguous and in submitting
issue to the jury.  Moreover, I believe that once the issue was properly before the
there was adequate evidence from which the jury could have found that Amana's decis
sell directly to P.C. Richard & Son, Cooper's largest account, and to other local o
was a breach of contract.

The majority bases its decision that the agreement unambiguously reserved
Amana the right to sell to retail dealers such as P.C. Richard on (1) the designati
Cooper's "right to purchase from Amana for resale" as "non-exclusive" and (2) the p
of Amana's reservation of "the right to make sales directly or through other channe
distribution" to listed categories with the words "including, but not limited to, s
to those categories.  Admittedly, the contract reflects an understanding that Coope
right to sell was not exclusive, even within its territory, and that the listing of
certain categories to which Amana could sell was not exhaustive, but it does not

56

necessarily follow that Amana unambiguously reserved the right to sell directly to [a] customer in Cooper's territory.

The first provision on which the majority relies states that the "Distrib[utor] shall have the non-exclusive right to purchase from Amana for resale."  App. 3979 (emphasis added). Patently, this does not apply to Amana itself.  The "purchase for resale" presumably applies to companies such as Cooper, which sell to retailers, a[nd the] provision's applicability to P.C. Richard, which sells only to consumers, is uncle[ar.] Thus, there is some ambiguity whether or why this provision has any application to [Amana's] right to sell directly to a local retailer.

The other provision on which the majority relies is the reservation claus[e.] Here Amana did indeed reserve the right to make sales "directly or through other ch[annels] of distribution" and prefaced the list of the other "channels of distribution" with the words "including, but not limited to."  App. 3981.  I find this more ambig[uous] than does the majority because none of the enumerated categories resembles a local account, such as P.C. Richard, and Cooper was unlikely to be in a position to sell effectively to any of the enumerated accounts.  The point is not that we could say [with] certainty that Amana did not reserve the right to make direct sales to retailers, b[ut] merely that the issue is not clear as a matter of law.  This is markedly different [from] the contract that was at issue in Manchester Equipment Co. v. Panasonic Indus. Co., [529] N.Y.S.2d 532, 533 (N.Y. Sup. Ct. App. Div.), appeal dismissed, 531 N.E.2d 299 (N.Y. [1988),] appeal denied, 534 N.E.2d 329 (N.Y. 1988), where Panasonic had expressly reserved "[the] unrestricted right to solicit and make direct sales of the Products to anyone, anyw[here]" (emphasis added).

Moreover, under Iowa law, the language reserving sales to Amana should no[t be] read in isolation. The ambiguity vel non of contractual language must be determine[d by] looking at the contract as a whole. As the Iowa Supreme Court said in Freese v. To[wn of] Alburnett, 125 N.W.2d 790, 792 (Iowa 1964), "[A]mbiguity appears when a genuine dou[bt] appears as to the meaning of a contract, and the instrument must be construed as an entirety." Moreover, "a contract will not be interpreted giving discretion to one p[arty in] a manner which would put one party at the mercy of another, unless the contract cle[arly] requires such an interpretation." Iowa Fuel & Minerals, Inc. v. Iowa State Bd. of Regents, 471 N.W.2d 859, 863 (Iowa 1991).

In Freese, the issue was whether a contractor who had drilled a well for [a town] under a contract requiring him to "[f]urnish and install all equipment for test pum[ping]" for a "[l]ump sum [of] $500.00" had an obligation to conduct a second test pumping [after] the well caved in. 125 N.W.2d at 792. The town contended that the contract unambi[guously] required the contractor "to test pump [the] well as many times as was necessary to [satisfy] the Town's engineer, for the sum of $500.00, in order to complete his basic contrac[t."] Id. The trial court, after considering evidence presented, refused to accept this contention and found the contract ambiguous, a somewhat different approach to ambig[uity] than followed by those courts which look only to the contract. The Supreme Court o[f Iowa] stated:

> Considering the evidence that this is a time-consuming and costly
> operation and that the contractor was required to follow implicitly
> the directions of the engineer, the trial court found considerable
> doubt as to the meaning of this contract provision. We must agree.

58

Id.  The Court then stated, "It would be most unfair and inequitable to hold [the contract] required the contractor to perform this expensive task as often as requi[red] the engineer."  Id. at 793.

Thus, we must look in the first instance at the entire contract to ascert[ain] whether it is consistent with all of its provisions to construe the provisions reli[ed] by Amana as unambiguously giving it the right to sell directly to Cooper's largest customer, one who accounted for one-third of its total Amana sales, and 60% of its [New] York Amana sales.  In making this inquiry, I do not suggest that a court should int[erject] terms into the contract that it deems fair and equitable but merely that the court decide from an objective standard whether the provision on which the party relies i[s] unambiguous when read in context of the entire contract.

In this case, we should look at whether the obligations that the Distribu[tion] Agreement imposes on Cooper are consistent with a reservation to Amana of the right [to] sell directly to retailers in Cooper's territory.  Like the Iowa Supreme Court in F[auser], I have "considerable doubt" whether they are, especially considering that 78% to 10[0%] Cooper's business was derived from the sale of Amana products.  For example, Cooper [was] required to use its best efforts to promote sales and "[t]o accept a minimum quota [as] determined by Amana based on sales potential in the territory."  App. 3979.  Such a [sales] quota would be meaningless if Amana could undersell Cooper at will by selling direc[tly to] Cooper's customers.  In addition, the Agreement obliged Cooper to "purchase and mai[ntain] an appropriate inventory of all Products in accordance with Amana's written program [and] policies."  Id.  Such a provision had the potential of stranding Cooper with useles[s] inventory if Amana could sell directly to the retailers.

Reading the contract as a whole, I believe it is ambiguous as to whether had the right to sell directly to retail dealers in Cooper's territory, and that the district court did not err in submitting the question of contract interpretation to jury. Therefore, I respectfully dissent in that respect.