[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION STATEMENT OF THE CASE
The defendant CUNO, Inc., is the manufacturer of a varied line of filtration equipment and related products which it designs and markets worldwide. CUNO has its headquarters in Meriden and maintains factories in Meriden, Enfield and Stafford Springs. CT Page 8689
In four separate written agreements dated Mary 1, 1984, the plaintiff (EFS) agreed to market, sell and distribute CUNO products in Connecticut and Western Massachusetts. This continued a long standing relationship originally involving CUNO and the predecessors of Mr. Edmands, one of whom was his father.
The agreements (Exhibits C, D, E F) contained language permitting either party to terminate the agreements on 30 day notice without cause.
On September 11, 2000, CUNO notified EFS of its intention to utilize this clause to cancel their arrangement. The cancellation letter also stated the reason for CUNO's action.
EFS then brought suit against CUNO, alleging a franchisor — franchisee relationship existed between the parties and that CUNO violated the Connecticut Franchise Act, Section 42-133e through 42-133h as part of a six count complaint.
Under this act, to establish that a franchise existed, the plaintiff would have had to show that there existed between the parties an agreement, pursuant to which the defendant substantially prescribed the plaintiff's marketing plan. The plaintiff also had the burden of demonstrating that the plaintiffs business was substantially associated with the defendant's trademark, trade name, or other commercial name or symbol.
The parties have stipulated that the court will address only the plaintiffs request for a permanent injunction on the franchise act count. This would prevent the defendant from terminating the plaintiffs services. The remaining issues are to be tried later.
 ISSUES
If a franchise were found to have been in effect, the defendant would have to show that the cancellation was for cause.
Absent a franchise relationship, the language of the agreements would permit the defendant to cancel without cause.
The issues to be addressed then are:
I. Was the relationship between the parties that of franchisor — franchisee and thus covered by the franchise act?
II. Assuming the applicability of the act, did the defendant have cause to terminate the agreements? CT Page 8690
 DISCUSSION I
Both parties rely heavily on the same case to support their positions,Hartford Electric Supply Company v. Allen-Bradley Company, Line.,250 Conn. 334 (1999). In that case (HESCO) the court examined the extent of the control exercised by the defendant-manufacturer over the plaintiff-distributor.
This "control" was examined in six vital areas of the relationship:
1. the existence of a "marketing plan";
2. the manufacture's control over pricing;
3. the power to hire and fire;
4. the imposition of training requirements;
5. the control of inventory;
6. the manufacturers' right to review financial records.
There is no precise formula as to how many of such factors must exist before the control exercised constitutes a marketing plan under the statute. Ackley v. Gulf Oil Corporation et als., 726 F. Sup. 353, 364
(1989), U.S. Dist. (1989)
The plaintiff here argues that the defendant exerted substantial control over it via the distribution agreements, an annual sales action planning session, the hiring and training of outside sales personnel, price setting, and control of its inventory. The distribution agreements are silent on these subjects so the plaintiff must demonstrate the "substantial control" was existed in the other areas. In HESCO and thePetereit case cited by the parties, the agreements prescribed in detail the obligations of the franchisee and the options available to the franchisor.
The omission of items 4 and 6, above indicates that the plaintiff is making no claim that the defendant imposed training requirements and had or maintained the right to review the plaintiff's financial records. This was conceded during final argument.
 A. CT Page 8691 The Annual "Sales Action Plan"
The "Sales Action Plan" (SAP) in which these parties participated was apparently an annual event and lasted only a few hours. The court recalls its reaction when Mr. Edmands testified and described the event. It seemed to be a very low key, non-specific, and informal exchange of ideas. EFS did not make a presentation nor bring exhibits. While EFS contends it was CUNO which set the goals and specific target accounts, Mr. Edmands admitted there were no penalties involved if EFS fell short of the SAP goals or if a potential account failed to produce a sale.
Surprisingly, Mr. Edmands testified that as he saw it, his knowledge of the sales territory was his own and he was not obliged to share this information with CUNO. Thus, he came to these annual meetings without a proposed plan and disclosed none of his inside data.
This is all in startling contrast to the situation in the HESCO case cited by the parties where the court found that the "defendant (manufacturer) prescribed in substantial part the plaintiff's marketing plan." (Id. At 365).
CUNO did not monitor EFS, did not send its sales personnel or technical experts on sales calls unless requested to do so and left EFS to follow up on accounts it felt had a sales potential.
In HESCO, the plaintiff was required to prepare a plan including targeted accounts, a promotion element, sales forecasts and training. HESCO was also required to utilize demonstration equipment. (Id. At 351). In this case, the court heard testimony, about the use of field test kits. CUNO claimed the availability of such a kit could save time in sales negotiations and enable the sales person to give prompt responses to a customer. The court finds it remarkable that despite these potential benefits of ownership, EFS had no such kit. CUNO did not require its distributors to utilize such kits, though most of them did make the modest expenditure to purchase them.
Other elements of a marketing. plan will be discussed subsequently, but from this discussion of the SAP's basic components, it is clear that there was no marketing plan. What did exist as such was not in any substantial part prescribed by the defendant.
 B. The Defendant's Control Over Pricing
CT Page 8692
Under the agreement between these parties, the defendant manufacturer's suggested retail price exists as a suggestion only and distributors are not required to comply with its terms. They are permitted to sell at prices higher than the manufacturer's suggested price and Mr. Edmands testified that he usually sells at prices well above those figures.
The plaintiff cites the Canoil account as representative of the control the defendant had over the plaintiffs charges. Testimony as to this account was conflicting to say the least but it is not typical of the business done between these parties. It involved the out of state sale of CUNO products. This conflicted with the territorial claims of distributors in other states, while EFS was attempting to lock in the out of state business because it had the customers' Connecticut business.
According to Mr. Nickerson of CUNO, he set the prices so that EFS and the California distributor would be treated the same. When the orders stopped, he called Mr. Edmands who was to arrange for a meeting of the interested parties. This never occurred.
The court does not find in the Canoil account dispute evidence of the defendant's exerting control over the overall pricing between these panties, especially after hearing testimony form the owner of Canoil who is presently in litigation with this defendant.
Returning to the HESCO case for guidance on this point, that court states:
"Thus, the ability to set prices is quite indicative of a franchiser's control." (Id, at 352. citation omitted).
In the HESCO case, the court found that the defendant instructed the plaintiff on price quotes for the training of customers on the defendant's products and dictated the prices that the plaintiff could charge when selling to national customers. The defendant published a product catalog of its products used by the plaintiff and listing a manufacturers's suggested price for each item. No evidence was offered to suggest that the other practices recited above were imposed on this plaintiff.
When a large purchaser looked for substantial discounts, these parties could enter into an agreement whereby each side would lower its price to enable the sale to be concluded. Save for the Canoil controversy, the plaintiff offered no evidence that such agreements resulted in control by the defendant.
For these reasons, the court concludes that unlike the defendant in HESCO, this defendant did not control the pricing of its products. CT Page 8693
 C. Hiring and Firing
The plaintiff makes no claim as to any action by the defendant to urge it to fire anyone. Rather, it urges the court to find that it executed substantial control over EFS in its hiring activities. It does not claim that it promoted particular candidates but that it urged the plaintiff to hire sales people who were qualified to sell in a technically complex field to sophisticated buyers.
Resorting to the HESCO case, the plaintiff urges the court to find the pressure it applied amounted "to the control that underlies a franchise relationship." Unlike the defendant in HESCO, the defendant here never imposed any penalties on the plaintiff because of its failure to hire and retain two sales persons. It never urged it to fire anyone. It never imposed conditions on the continuation of the relationship between the parties.
Actually, the plaintiff made hiring and firing decisions on its own. Up to the time when it terminated the distributor agreement, the sum total of pressure and control exhibited by the defendant was in a series of memos and conversations exhorting the plaintiff to restore its sales force to where it had been for many years. The lack of control over the hiring process is illustrated by the plaintiffs refusal to advertise for sales persons outside of Connecticut because it was not willing to pay relocation costs. The defendant had no control over that decision.
The plaintiff cites as an example of the pressure exerted by the fact that when no hiring occurred, the plaintiff was terminated. The defendant's response is that its territory was not being serviced and its interests were at risk. But this extreme action was not taken during the relationship between the parties but at the point of termination, and the plaintiff argues that the memos from the defendant constituted a series of threats. A review of these memos (Exhibits 8-18) dated December 17, 1996 through March 15, 2000 reveals only one which contained language which one could consider a threat.
In a December 17, 1996 letter, CUNO closes with "If a salesman is not hired by the end of January, we will assume Eastern Filter will not replace Craig and adjust our plan accordingly." This obviously did not instill fear in the plaintiff for the requests went on as noted above until 2000. Nor was this "threat" ever developed at trial so that the court assumes it means what it says, that the defendant would adjust its plan for sales in the plaintiff's district. The fact that the plaintiff CT Page 8694 did little in response to these requests for over three years and the defendant took no action until almost four years later, does not suggest the exertion of control by the defendant over the hiring process.
The court concludes that the defendant did not control the hiring and firing of the plaintiff's employees and that its efforts to have personnel hired were reasonable and rendered necessary by the vacancy that existed and the threat to its own business interests.
 D. Control of Inventory
The plaintiff has enunciated no claim on this topic which. the court can address. It has only quoted the "Stock Adjustment Policy", a refund policy permitting EFS to return to CUNO products it purchased but did not sell.
The court heard no evidence that the plaintiff was required to carry any minimum amount of inventory and the plaintiff has no reporting obligation with respect to this subject. Nor has the plaintiff shown that the defendant imposed any warehouse capacity requirements. Accordingly to Mr. Edmands, most of the CUNO products he sells never see his warehouse. CUNO directly ships to EFS customers 70% of what they purchase from EFS. In oral argument, plaintiff's counsel conceded there was no requirement the plaintiff stock items and products, but argued there was an "implied reasonable stocking agreement." He failed to demonstrate what this "agreement" was, and how it tended to exert control over the plaintiff.
This claim must be resolved for the defendant.
 E. CONCLUSIONS AS TO CONTROL AND MARKETING PLAN
As noted above in Sec. I, the court did not find that there existed between the parties a marketing plan prescribed by the defendant.
The failure to prove the defendant controlled pricing, hiring and firing, and inventory serves to re-enforce that conclusion, as the plaintiff has not shown that the control exercised by the defendant is sufficient to constitute a marketing plan or system. And, that the system was prescribed by the defendant.
The court concludes that the plaintiff has not met his burden to establish that a franchise existed by virtue of the control exercised. CT Page 8695
 II SUBSTANTIAL ASSOCIATION
Section 42-133e (b) defines a "franchise" in these terms:
 "Franchise" means an oral or written agreement or arrangement in which (1) a franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor, provided nothing contained herein shall be deemed to create a franchisor-franchisee relationship between the grantor and grantee of a lease, license or concession to sell goods or services upon or appurtenant to the premises of the grantor, which premises are occupied by the grantor primarily or its own independent merchandising activities; and (2) the operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising or other commercial symbol designating the franchisor or its affiliate, and includes any agreement between a manufacturer, refiner or producer and a distributor, wholesaler or jobber, between a manufacturer, refiner or producer and a retailer, or between a distributor, wholesaler or jobber and a retailer.
Subsection (2) is relevant here in view of the plaintiffs claim that he is "substantially associated" with defendant under its terms.
The plaintiff points to its sale of CUNO products in the same trade area for thirty years. Although it is free to sell the products of other manufacturers, CUNO products constitute 93 or 94 percent of sales. The plaintiff supported its association claim by offering a pile of CUNO advertising circulars, (Exhibit G), yellow page advertisements for two phone books and a business card of an EFS salesman.
While the high percentage of CUNO product sales would seem to support the plaintiffs position, this aspect of the plaintiffs business is totally under its control. CUNO imposes no restrictions on EFS sales of products of other manufacturer's products, except that they not be competitive with CUNO products. Without evidence of market conditions which prevail and might have an effect on EFS decisions as to what product to sell, and what other products are available and eligible for EFS to sell, the court cannot properly weigh this factor. It certainly shows EFS did most of its business with CUNO.
The yellow page advertisements offered by the plaintiff are for the CT Page 8696 year 1997-98 and are included in a Norwalk directory and the Stamford-Greenwich directory. They state "CUNO filter systems" and list EFS's title, address and phone number under the caption "Stocking Distributor." On the other hand, the defendant offered extracts from the 1998-99 New Haven phone book. There, the plaintiff is listed in both the white pages and the yellow pages without any mention of CUNO.
Similarly, the business cards of a former EFS salesman bears a CUNO logo and an EFS logo, but the business card of Mr. Edmands only carriers the EFS logo.
The sales material in Exhibit G consists of 68 items, all identified as CUNO circulars. They all bear a blank space . . . captioned "Your local CUNO distributor," or similar language. EFS has stamped its name, address and phone number on 13 items. The remainders are blank. Exhibit P, a sales brochure, is also stamped by EFS.
The distribution agreements are silent as to any obligation on the part of EFS to display CUNO signs or logos. Nor is the defendant CUNO required to provide the plaintiff with promotional material.
In HESCO, the court commented on these facts and noted that the plaintiff distributed the manufacturer's materials bearing its logo and flyers it used carried the defendant's logo.
In addition, the plaintiff prominently displayed a sign with the defendant's name on its premises.
In its discussion in HESCO, the court noted that the plaintiffs customers in the trade came to think of the parties as "one and the same" identity. (Id., at 360). No such conclusion is possible in this case as no such evidence was offered. Federal Courts have commented on this point. In distinguishing its position from that of the New Jersey Supreme Court, the third circuit has said:
 ". . . . we have held that dependence on a single suppler cannot automatically qualify a distributor for protection under the Act (or else all exclusive distributors could unilaterally decide to convert their distributorships into franchises." Cassidy, 944 F.2d at 1141).
 Cooper Distributing Co. v. Amana Refrigeration, Inc., 63 F.3d 262 (3rd Cir 1995) at 272.
The most that can be said of this relationship is that it had endured for 30 years and the loss of the CUNO business would probably decimate the CT Page 8697 plaintiff. However, this can be said of many business relationships. Further, that fact done does not seem to satisfy the requirement of "substantial association" state above.
 III "Good Cause" A.
Franchise terminations are addressed in § 42-133f of the Connecticut Franchise Act. The portion of the section reads as follows:
 "Termination, or cancellation of, or failure to renew a franchise. (a) No franchisor shall, directly, or through any officer, agent or employee, terminate, cancel or fail to renew a franchise, except for good cause which shall include, but not be limited to the franchisee's refusal or failure to comply substantially with any material and reasonable obligation of the franchise agreement or for the reasons state in subsection (e) of this section."
Subsection (e) is not applicable to this case.
Both parties have cited a United States Second Circuit case which examined this subject. In Petereit et al v. S.B. Thomas, Inc.,63 F.3d 1169 (1995), the second circuit reversed the district court and held that "good cause" in the franchise setting is not limited to poor performance of the franchisee but it also allows the legitimate business concerns of the franchisor to be part of the "good cause."
 "Allowing the legitimate business concerns of a franchisor to be a part of the `good cause' equation odes not require a showing of unprofitability. Such a requirement would make the balance between franchisor and franchisee fanciful. A seller of goods in the marketplace is justified in identifying untapped opportunities or unutilized potential and adjusting its distribution network to realize greater profits. When the franchisor demonstrates that its business decision is legitimate and made in good faith — even if shown by hindsight to be made in error — a court should not replace the grantor's decision with its own. See State Distributors, Inc., 738 F.2d at 413."
Id., at 1185.
Though the plaintiff argues to the contrary, our Supreme Court specifically noted its agreement with Petereit in the HESCO case, stating CT Page 8698 at page 363:
 "Consequently, in order to prove `good cause,' a franchisor would have to show that the franchisee either failed to or refused to comply substantially with a material and reasonable term of the franchise agreement, or that the franchisor had an equivalent business reasons of a similar nature."
The court then goes on to say that the legislative history of the franchise act "supports our reading." Id. at 363.
Examining the defendant's evidence supporting its business reason, the court concludes that the defendant demonstrated its decision to terminate the plaintiff and to market its products directly was legitimate and made in good faith.
First if all, the direct sales approach had been implemented in the mid-Atlantic sales area with positive results. This included progress in the pharmaceutical area — one which the plaintiff has apparently shied away from because such sales are modest at the onset and often develop into more substantial sales but out of his sales area. The parties have disagreed over the coverage of pharmaceutical companies and the defendant is already doing direct sales in this field and the plaintiff has stated he does not feel he wants to place a sales person on the pharmaceutical circuit.
The direct sales approach would give the defendant the choice in hiring, firing and training. With a substantial presence in Connecticut already, it could have its sales personnel in direct contact with technical and managerial assistance. It should also be noted that at present, the bulk of the plaintiffs sales of CUNO products are shipped directly from CUNO facilities in Connecticut to the customers. In effect, the defendant is providing the plaintiffs warehouse and feels it is not a good business practice for it to be providing all the services to create a role for the plaintiff, when that role is perceived by the plaintiff as entirely different from the one envisioned by the defendant.
The court heard detailed testimony from Mr. Doina, CUNO's vice president and general manager. He noted that the defendant's chief competitors have gone to a direct sale approach. He feels CUNO is at a distinct disadvantage especially in light of Mr. Edmands views on covering the territory.
The court will not address all the details of the testimony it heard, but reference to that of Mr. Nickerson is significant. He outlined his perception of the market and the coverage being given to the area by the CT Page 8699 plaintiff, as opposed to what CUNO directed sales personnel could do.
The plaintiff has argued that the defendant's decision to change to direct sales was improperly made, in part because it performed no survey or study to determine the wisdom of that decision. He cites no case law which would dictate such action.
In fact, this claim would appear to be contrary to the Connecticut Franchise Acts goal of balancing the interests of franchisees and legitimate business decisions of franchisors.
The defendant has made out a compelling case in favor of its decision to go to direct sales.
 B.
The defendant further claims the plaintiff violated the agreements of the parties by failing to provide adequate sales coverage for the territory.
While the plaintiff had consistently employed two outside salesmen, with the departure of one salesman in 1996, he was either unable to unwilling to maintain two sales persons. Though he claimed to have been diligent in his hiring efforts, advertising for sales personnel was restricted to Connecticut because the plaintiff was unwilling to pay relocation costs.
There was also a high turnover rate of those who were hired, creating concern on the part of the defendant that customers would lose their confidence in CUNO and its products.
Based on the testimony of Mr. Edmands and Mr. Doina, one must conclude that there is a definite difference of opinion between the plaintiff and the defendant as to how this sales territory should be serviced.
Mr. Edmands is a proponent of telemarketing, with phone or e-mail contacts. CUNO feels its products must be sold based on their technical quality and that the direct person to person approach is vital. Its competitors rely on this approach and a presence is deemed to be essential to holding old customers and finding new ones.
The defendant has cited numerous instances which appear to support is perception that EFS is not living up to the agreements. A major EFS customer, AM Fluids, acts as a re-distributor, re-selling all he purchases, yet neither EFS nor CUNO know the end users of the products he purchases. CUNO argues there would be no way for AM to do this if EFS were CT Page 8700 on top of its market and it leaves the defendant with serious questions about the market and how it will progress. Without AM, EFS would be in a weakened position, yet it is a veritable "unknown" as to its operation and re-sales.
CUNO argues it knows of no distributor in this field which operates as does EFS, spending 7 hours a week on sales calls. The defendant feels personal sales calls of 40 to 60 a week are the norm in the trade. Alarmingly, EFS hasn't had a new customer in 2 years and has done virtually nothing with new products introduced by CUNO, while his counterparts have done very well.
Mr. Battersby's testimony about the Alexion account reflects an attitude on the part of EFS that is consistent with its philosophy but at direct odds with CUNO's.
On the evidence it has heard and the cases examined, the court finds the plaintiff did not live up to the terms of the agreements and the defendant had good cause to terminate on this ground as well. On this point, the court feels obligated to remark on Mr. Edmands' testimony and the position he took when his operation was questioned.
He apparently is not prepared to address any of CUNO's concerns. He is comfortable with his customer visitation policy, despite having been informed of the displeasure of some customers. A failure to visit from 4 to 6 months is not seen as detrimental and a total of 6 visits to a customer in 2 years is acceptable.
The court cannot require this defendant to be wed for life to a distributor whose philosophy is totally at odds with its own and with the stated position that the position will not change.
 CONCLUSION
A permanent injunction can issue only upon the applicant sustaining its burden by clear and convincing evidence.
This plaintiff has failed on every one of its claims and therefore the application is denied.
 ___________________ ANTHONY V. DeMAYO JUDGE TRIAL REFEREE